02-12-347-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-12-00347-CV

 

 


 
 
 In
 the Interest of C.C.K. and C.S.K., Minor Children
  
  
  
  
  
  
 
 
 §
  
 §
  
  
 §
  
 §
  
  
 
 
 From the 158th District
 Court
  
 of
 Denton County (2011-20180-158)
  
 February
 7, 2013
  
 Opinion
 by Justice Walker
 
 


JUDGMENT

 

          This
court has considered the record on appeal in this case and holds that there was
no error in the trial court’s judgment.  It is ordered that the judgment of the
trial court is affirmed. 

 

SECOND DISTRICT COURT OF APPEALS 

 

 

 

By_________________________________

   
Justice Sue Walker

 

 

 


 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-12-00347-CV

 

 


 
 
 In the Interest of C.C.K. and C.S.K., Minor
 Children
 
 
  
 
 
  
 
 
 
 
  
 
 
 
 
  
 
 
  
 
 
  
 
 


 

----------

FROM THE 158th
District Court OF Denton COUNTY

----------

MEMORANDUM
OPINION[1]

----------

I.  Introduction

This
is an ultra-accelerated[2]
appeal in which Appellant Mother appeals the termination of her parental rights
to C.C.K. and C.S.K.[3]  In two issues, Mother
argues that the evidence is factually insufficient to support the trial court’s
best interest finding and that the trial court’s statement to the jury that the
jury was to consider only the issue of termination constituted de facto testimony
of the judge as a witness in violation of Texas Rule of Evidence 605 and an
impermissible comment on the evidence.  We will affirm.

II.  Factual and Procedural Background

The
voluminous twelve-volume reporter’s record, including the exhibits, reveals that
Mother has been struggling in multiple areas of her life—emotionally, mentally,
relationally, and financially—for many years, as demonstrated by several
incidents of domestic violence, a pattern of alcohol abuse that resulted in a
variety of criminal charges, a history of CPS involvement, frequent job changes
and periods of unemployment, reliance on others to pay her bills, multiple
relocations, and the eventual loss of her home.  Interlaced with these issues
were the problems Mother faced in raising a son with behavioral issues and her repeated
decision to resort to disciplining with physical abuse on numerous occasions.  Because
Mother challenges the factual sufficiency of the evidence to support the jury’s
best interest finding, we set forth the details of her struggles below.

A. 
Mother’s Background

Mother was thirty-two years old at the time of the
termination trial and testified regarding her background.  Mother
had a felony charge for possession of a controlled substance in 1998.  When
asked about her illegal drug use during her 2009 psychological evaluation, she
reported, “I used all of them until 2002. I’ve been clean since.”  She reported
that the drugs she used most were heroin and speed, and it was noted that Mother
had contracted hepatitis C from intravenous drug use.  Mother moved to Temple,
Texas, in 2002 to go to rehab. 

Mother testified that she had identified herself as an
alcoholic since before her children were born.  Before her children were born,
Mother drank to blackout level.  She had attended Alcoholics Anonymous from
2002 to 2004.  She then used church to maintain her sobriety.

Mother met Father at church in Temple in October 2003; he
moved in with her, she got pregnant, and they married in October 2004.  Mother
smoked for the first four months of her pregnancy with Collin even though she
knew that she was pregnant.  Mother testified that she was clean and sober when
she was pregnant.  Records, however, from Collin’s 2011
hospitalization at Cook Children’s Hospital revealed that Mother “confirm[ed]
to using drugs during pregnancy with [Collin].” 

Three months after Father and Mother were married, while
she was eight months pregnant, Mother noticed Father’s “bizarre behavior.”  He
was having delusional ideations while they were in bed, and his behavior scared
her.  Mother called Father’s sister Jacki,[4] who came and picked her
up and told her that Father had been diagnosed at age eighteen with bipolar
disorder and later was diagnosed with drug-induced schizophrenia.[5]
 Mother did not return to Father until he admitted himself to the hospital in
January 2005. 

B.  2005 Family Based Safety Services (FBSS)
Case

At the time of Collin’s birth in February 2005, Father
was hallucinating in the delivery room while Mother was in labor, and then he was
aggressive with Mother while she was recuperating from childbirth.  The Department
of Family and Protective Services (hereafter referred to as “the Department” or
“CPS”) thereafter received a referral regarding concerns about domestic
violence in the home, Father’s mental health, and Mother’s lack of bonding with
the child in the hospital.  

Two weeks after Collin’s birth, a caseworker came to Father
and Mother’s home; Father was not cooperative.  Mother left with Collin and
went to live at Jacki’s house for two or three months.  After that, Mother
moved in with her aunt and uncle (Mike and Patty) in Denton; Father stayed in
Temple.  Mother’s bonding was evaluated while she and Collin lived with
relatives.  Mother successfully completed FBSS services, Mother was found to be
protective of her children, and the case was closed. 

C.  Mother Reconciles with Father

Father started taking medication, was cooperative with
CPS, and was making progress, so Mother reconciled with Father, moved back to
Temple at the end of 2005, and chose a cosmetology school in Killeen.[6]
 Mother testified that Father was competent and a hard worker when he was on
his medication.  Mother completed cosmetology school and obtained her license.[7]
 Mother and Father bought a house in Morgan’s Point and lived there for about
six months. 

D.  Father Chokes Mother; They Separate

In August 2006, Father choked Mother and banged her head
on the floor during an argument over bills.[8]
 Collin was eighteen months old and was present in the room.  Father was
charged with assault–family violence.  Mother left Father and rented her own
apartment in Temple.  A month later, she found out that she was pregnant with
Carol, but Mother remained separated from Father.  Mother gave birth to Carol
on May 15, 2007. 

E.  Mother Reconciles with Father Again

Mother reconciled with Father in June 2007, and they
moved to Denton as a family with Collin and Carol.  Father was on his
medication and treated Mother and the children well while he was on it.  

F.  Father Slaps Mother; Mother Moves into
Shelter

In August 2007, Father backhanded Mother in the face and
broke her teeth while she was holding Carol.  In October 2007,
Father acted belligerently toward Mother and displayed behaviors in
front of Collin that Mother did not want him to grow up with.  Mother
explained that Father had called Mother obscene names, that she had covered Collin’s
ears, and that Collin had screamed because he was scared.  Mother left Father
and moved into a shelter.  Prior to leaving, Mother had gone to marriage
counseling for three months. 

G.  Mother Allows Father to Keep Children;
Father Abuses Carol

After Mother moved into the shelter, she allowed Father
to keep the children one weekend.  When Mother went to pick up the children, the
left side of Carol’s face was bruised and swollen.  Father said that Carol had
fallen off the couch onto a toy, but Mother did not believe him because there
were fingerprints visible on her face.  Mother continued to question Father
until he explained that Carol was hungry in the middle of the night and would
not stop crying; Father thought that slapping her “would work.”[9]
 Mother went back to the shelter and had them call the police; she obtained a
protective order; and Father was ultimately convicted of injury to a child and placed
on felony probation.  Mother also notified CPS, and a CPS complaint was
initiated as a result of the incident.  Mother regretted having let Father keep
the children for the weekend.[10] 

H.  Mother Divorces Father

Mother stayed at the shelter for two months before
renting a duplex in Denton.  Mother’s rent was paid by Hope, Incorporated, and
she worked part-time and went back to school to become a dental assistant.  During
2008, Mother enrolled Collin in play therapy at the University of North Texas
(UNT), and she started in counseling at UNT and read parenting books.  Mother also
filed for divorce, which was final December 15, 2008.  

I.  Mother Spanks Collin and Leaves Bruises

In January 2009, CPS received a referral from Delaney
Gregory, a former Head Start teacher with Denton ISD, involving bruises on
Collin’s bottom.[11]  Mother testified that
she had spanked Collin, who was four, too hard.  Mother testified that she usually
spanked three times with a wooden spoon, but during this incident, she had
spanked more than three times and fewer than ten times. Mother said that CPS
did not open a case but told her that the spanking constituted excessive
discipline and that she needed to try other methods. 

J.  Collin’s
Behavior and Physical Abuse Findings in 2009

Gregory
testified that she taught Collin in spring 2009 and fall 2009 when he was
three.  Collin
had numerous tardies and absences in fall 2009, some of which were due to not
arriving until after 10 a.m.  

Gregory
said that Collin “seemed to go from one end of the spectrum to the other”;
sometimes he would be very hyperactive, and other times he appeared lethargic
and “spacey, like he just wasn’t there.”[12]  Gregory
described Collin as “a bright little boy” who had a lot of potential for
learning and was capable of learning the basics, but “his behavior got in the
way more than anything else.”  Gregory testified that Collin had a difficult
time with authority, became upset easily, and then would “fly off the handle.”  He
was not violent but could be very aggressive toward other children.  Collin’s
behavior issues were significantly more difficult to deal with than the other
children’s in the classroom. Whenever Collin misbehaved, Gregory talked to him
and put him in timeout. Collin had trouble staying in the timeout area, so a volunteer
would stay with him. Collin required attention, repetitive instructions, and
structured boundaries.  

Mother
seemed receptive to the information that Gregory provided regarding Collin and
any discipline or other issues that Gregory had in the classroom.  Although Gregory
felt like Mother loved Collin, it appeared to Gregory that Mother was not
always patient with Collin; she seemed exasperated and worn out.[13] 

Gregory
made a home visit to the relatives’ home where the children and Mother were
living.[14]  Mother
was present, but was curled up and did not seem to be emotionally present.  Gregory
went over how Collin was growing and things that needed work, but she did not
feel that Mother connected with what she was saying.  Gregory
thought that Mother was under the influence of drugs, and Gregory’s
understanding was that was why they were staying with a relative.  Mother had
told Gregory on a couple of occasions that she was having problems with drugs
and that she was trying to get help. 

K.  2009
FBSS Case

Nicole
Eleata Swan received the case in 2009 due to concerns of physical abuse of
Collin by Mother.  The allegations were that Mother was physically abusing
Collin and that she had been very stressed out by being a single parent and by
Collin’s behaviors.  Collin had bruises that were possibly inconsistent with
the explanation Mother had given.  

Swan
had difficulty meeting with Mother; Swan was supposed to meet with Mother three
times a month for three months but met with her only a handful of times.  When
Swan met with Mother, Mother seemed frustrated with Collin’s behavior in running
around and not listening; she would yell at him, and it would take several
times before he would stop.  Sometimes Collin was hyper—running around,
climbing the stairs backwards or on the wrong side, not sitting at the table
correctly—and other times, he would calmly play with his toys.  

Swan
observed one occasion when Collin was tied to his car seat with pantyhose.  Collin
tried to get out by walking around with the car seat on his back.  Mother testified
that she did not tie Collin to the car seat with pantyhose, but she admitted
that she had previously buckled Collin in the car seat for timeouts until he
started carrying the car seat around with him.  Mother later clarified that she
had tied up Collin with pantyhose once; it was “a lie” that the caseworker told
about seeing Collin walking around with the car seat tied around his waist with
pantyhose.  Mother testified,

You know, it just
didn’t work anymore.  And I put [Collin] in his room in the car seat, and he
pulled the sheets off of his bed and knocked over some bookshelves.  So I
brought him back downstairs, and I took him out of the car seat and I just let
him go and he started destroying the living room.  So I restrained him there.

 

And it was difficult.
He was crying.  I was crying. And he was trying to bite me, trying to bite
himself. And I didn’t know how to handle it. And I was completely upset and so
was he. So I thought if I could restrain him that he would be controlled. If I
could restrain him without actually being near him, then I would be able to
calm down and he would eventually calm down as a result of the control.  

 

So I tied his wrists together with
pantyhose and I tied his ankles together with pantyhose, and the blood started
to rush to his hands and ankles.  When they started to turn purple, I took the
pantyhose off of him. They were probably on him for five minutes.  It doesn’t
take very long for blood to rush. And I immediately called 911 myself and
explained to the police officer what I had done. 

Swan
informed Mother that restraining with pantyhose was not an appropriate form of
discipline, and Swan worked with Mother on appropriate discipline measures for
Collin. 

Swan
was concerned about Mother’s mental health, and so Swan referred Mother to
counseling, to in-home parenting, and to MHMR for an assessment. The referral
for counseling was for Mother and Collin because Swan wanted the counselor to
work on the relationship between Mother and Collin.  Swan thought that the
filial therapy provided by Molly Kuzmich would help Mother deal with Collin’s
behaviors, but Mother went only one time; she gave Swan reasons why she did not
go, including her work schedule.  

FBSS
could have provided services for a longer period of time, but Mother was not
following through with her services, and FBSS had received three new referrals
in a short period of time.  One referral involved Mother’s mother, who came
over to Mother’s house extremely intoxicated, got into an argument with Mother,
and threw a beer bottle against the wall or outside.[15]  The
second referral involved Mother’s taking Collin to UBH, a behavioral health
hospital, and mentioning that she had tied him with pantyhose to his car seat.  The
third referral involved bruising on the children.  An investigator met with
Mother and addressed the referrals while FBSS tried to get Mother to engage in
her services. 

L.  2009
CPS Case; Children Removed

All
of the referrals “seemed to be validated,” so ultimately, the FBSS case was
closed, a CPS case was opened, and CPS took custody of the children.  Mother
testified that she thought that more services could have been offered to her as
a single parent; she did not feel like it had to come down to separating her
from Collin in order to help the situation. 

Lori
Trulson, who served as a conservatorship worker for the children, testified
that the children were initially placed in foster care and later placed with Patty,
the children’s great aunt.[16]  The
children were out of Mother’s home for eight months, during which time Collin’s
behavior improved; Collin started on medication to help with his behaviors, and
Patty had a lot of structure in her home, which Collin benefitted from. 

The
initial issues that Trulson identified to address with Mother were stability,
inappropriate discipline, and staying on her medication for her mental health.[17]  To
address Mother’s issues, the Department provided individual counseling, a
psychological evaluation, parenting classes, an intake at MHMR, and couples’
counseling to address co-parenting.  Mother went through a twelve-week “love
and logic” course and a basic needs parenting class.  Mother also started on
medication to help with her anxiety and depression.  Mother owned a car and was
able to take herself to appointments.  Mother was “very cooperative” in working
services in 2009 to 2010.  

M. 
Mother Receives Children Under Monitored Return

 By
June 2010, Mother had worked her services and had made enough progress that the
Department felt it was appropriate to return the children to her under a
monitored return.  Mother had rented a three-bedroom apartment
and was employed full-time as a dental assistant.  Mother
felt ready for the children’s return and felt like she had a handle, for the
most part, on Collin’s behavior.[18] 

Trulson
testified that during the eight months that Mother’s children were in CPS care,
she had worked five jobs.[19]  During
the monitored return, Mother lost her job because she had trouble
getting to work on time.  She said it was difficult to get a routine in place
for Collin and that it was hard to get out the door in the morning.  Once she
“finally got the routine better,” it was too late because she had been tardy
too frequently to keep her job.  Mother then took a job at a temp agency, but
she was barely getting by financially.  The Department paid for daycare and had
to assist her with paying her electric bill.  Mother’s instability
with her employment caused her problems in making timely rent payments. Mother
was able to get food stamps and Medicaid, which helped with Collin’s
medication, visits to the psychiatrist, and regular doctors’ visits.  Mother
testified that her primary issues during this time were financial issues but
that she also needed to gain parenting and coping skills.  Mother said that she
worked on these issues but did not master them.

Mother
discussed Collin’s behavior issues with Trulson, who suggested that Mother use
a behavior chart and a treasure chest to reward good behavior. Mother
implemented Trulson’s suggestions, which worked at times, but she noted that it
was hard to be consistent “with everything that was going on.”  Mother did not
recall having to restrain Collin during the monitored return, but she did
recall having a problem with keeping him in timeout.  Mother
testified that she locked Collin in his room during timeout and that there was
no child monitor in his room.

Collin
and Carol reported to Trulson some of the discipline that they had received
during the monitored return.  Trulson went over the discipline policy again,
and Mother signed the discipline policy again. 

Trulson
was aware of only two instances when Mother drank alcohol.  Trulson did not
testify regarding the first instance, which was reported to her by Patty. 
During the second instance, which occurred in November 2010, Mother was out
drinking with a friend of hers, and he was supposed to drop her off at her
residence.  Instead, he drove to Frisco, and Mother somehow got out of the
truck and called 911.  The police brought her back to her house.  Mother did
not have the key to her residence, so she knocked on a neighbor’s door.  The
neighbor called the police, and the police arrested Mother for public
intoxication.  Mother had the children as part of a monitored return at the
time of this event. 

Before
the case was closed, Mother had an incident that she did not report to her
caseworker; she drank to the point of passing out in a bar and woke up in the
hospital.  Mother’s blood alcohol level was well beyond the legal limit.  Mother
testified that she was not drinking all the time, but when she did drink, she
had a problem stopping.  Mother described herself as a “binge drinker.” 

At
the end of the six-month monitored return, the Department closed their case,
and Mother received custody of her children.  Trulson felt that
Mother had internalized what she had learned in her classes but that sometimes Mother
had trouble putting it into practice because of the daily stresses of getting
kids to school and going to work. 

N. 
Collin’s Behavior at Daycare and School

Christie
Matthews, who previously served as director of Children’s Lighthouse, a
daycare, testified that Collin and Carol were enrolled in childcare on August
31, 2010, and stopped coming in April 2011.  The daycare kept Collin after
school and kept Carol all day.  Mother received assistance from the State to
help pay for childcare. 

Mother
told Matthews that Collin had been diagnosed with ADHD and oppositional defiant
disorder (ODD) and that there was concern that he might have Asperger’s
Syndrome or bipolar disorder.  Collin was on medications to help regulate his
behaviors, and all of his medications were given at home.  From August until
December 2010, Collin did very well.  

Collin’s
kindergarten teacher told Mother that Collin was the lowest progressing child
in the classroom and that he could not keep his hands to himself.  The teacher
thought that he was overstimulated.  Mother asked Collin’s psychiatrist if he
could put him on a less stimulating medication so that he could keep his hands
to himself and be able to focus on his homework, and the psychiatrist changed
Collin’s medication from Adderall to Concerta in December 2010.[20]  Collin
experienced side effects from the medicine.  For instance, he started picking
scabs, twisting the hair on his head until it fell out of his scalp, and asking
questions repeatedly.  Mother testified that it took “a while to start, for it
to build up in his system in order to bring it to full recognition.” 

Matthews
described Collin as a very sweet boy with age-appropriate behaviors, but after
the holiday break (which was after CPS had stopped monitoring and had closed
the case), he started exhibiting aggressive behavior and went downhill.  Matthews
was aware that there was a medication change and admitted that it could have
contributed to Collin’s aggressive behavior.  Matthews noted that Collin was
hitting and scratching children, and on the bus, he was biting, kicking,
spitting, talking back, punching, and displaying aggressive behavior toward the
teachers.  Collin did not respond to redirection; he usually had to be sent to
the office for correction.  Numerous times, the daycare called Mother to come
pick up Collin.[21]  Matthews
contacted Mother about Collin’s behavior, and Mother said that she would
contact the doctor to have his medication changed.  Mother told Matthews that
she would give Collin more medication than what the doctor had prescribed for
the afternoon if he was having issues.  Matthews testified that it would be
difficult to parent Collin twenty-four hours a day, seven days a week, even
with his being medicated. 

Matthews
said that the children appeared to be fed and were clean; she did not have concerns
about Mother’s parenting.  Matthews thought that Mother loved Collin and that
Mother was trying because she kept looking for solutions.  

O.  Mother
Gives Collin the Wrong Medication

On
February 21, 2011, Mother accidentally gave Collin her Wellbutrin instead of
his Risperdal.  She said that it was early in the morning and that she was
“half asleep like a robot,” that she grabbed the wrong bottle, and that she gave
him the wrong medication.  When Mother recognized her mistake, she called the
school right away to have them check on Collin. 

Gaye
Robin Estes, the school nurse, testified that when she was alerted to the
problem, she called Poison Control because Collin was “a little
jittery.”  Estes also called Mother and informed her that Collin needed to be
taken to the emergency room because the school could not care for him in his
condition.  Mother did not immediately come and pick up Collin.


CPS
received a referral related to the Wellbutrin incident.  Tina Harris, the
investigator assigned to the case, gave Mother suggestions on how to prevent a
mismedication from happening again. 

P.  Collin Taken to
Emergency Room for Hallucinations

and Medication Changes

          On
February 26, 2011, Mother took Collin to Cook Children’s Hospital because he
was having hallucinations and had attempted to wrap a seatbelt around his neck.
 Collin’s
medication was changed three times while he was there, and he was released ten
days later.  Mother told the doctors that she did not believe that he was ready
to go home because his medication had not been monitored long enough to make
the assessment regarding whether he was ready to go back to regular school. 

The day
after Collin was released from the hospital, he bit a child, breaking the skin.
 That weekend, Mother followed the “love and logic” discipline protocol and
grounded Collin from playing with his friends and restricted him from playing
with certain toys.  

Q. 
Mother Charged with Injury to a Child for Biting Collin

During
the following week, which was spring break, Collin had four incident reports in
five days at daycare.  Mother increased Collin’s restrictions, and Thursday
evening, he bit his sister.  Mother talked to Collin about all the ways she had
tried to correct his behavior, told him about gentle touch and being
considerate of others, and then warned him and bit him.  Mother testified,

I did it so that he could understand how he was affecting
another child.  And he was crying and I hugged him and I apologized.  And in my
mind at the time, it was a last-ditch effort so that he could comprehend what
the seriousness of the matter was.  It wasn’t so that I could tear a chunk out
of my child.  I didn’t haul off and beat the crap out of him.  I just -- I
thought developmentally it would work, but it wasn’t. 

Mother
agreed that her bite was hard enough that it left bruises on him that were
visible five days later.  

Denton
Police Officer Jason Kolba testified that he responded to an injury-to-a-child
call on March 20, 2011, at the police department.  Father had brought Collin to
the police station because he was concerned about an injury that he had noticed
on Collin when he had picked him up from a child visitation.  Collin said that
Mother had bitten him.  Officer Kolba noted that the diameter of the bite was
an inch and a half and that the bruise was yellow and purple.  While at the
police station, Father called Mother on speaker phone and asked her what had
happened to Collin.  She said that Collin had bitten Carol and that she
(Mother) had bitten Collin to show him what it felt like.  Officer Kolba filed
an offense report against Mother for injury to a child[22] and
made a report to CPS. 

Harris
received the referral relating to the biting and “a very significant bruise”
and interviewed Collin.  Collin said that he had bitten his sister and that Mother
had bitten him.  Mother told Harris that she had bitten Collin because he had been
biting children at school.  Mother admitted that she had not learned that
tactic in the twelve weeks of her parenting classes and understood that it was
not an appropriate form of punishment. 

R. 
Daycare Puts Collin on Aggressive Behavior Plan

On
March 25, 2011, the daycare put Collin on an aggressive behavior plan, which
Matthews explained as a correction action plan to help Mother and Collin
understand that they were serious about his behavior and that it needed to be
corrected in order for childcare to continue.  Mother responded by saying that
she would talk with the doctor. 

S. 
Collin Not Properly Medicated

On
April 14, 2011, Collin was “completely out of control at school,” and the
school alleged that Mother was not medicating Collin and was not following
through with MHMR. 

T.  Mother
Overmedicates Collin; CPS Removes Collin

Kelly
Parish, a special education inclusion teacher, testified that on the morning of
April 15, 2011, Collin came to school very lethargic and sleepy.  Collin’s
teacher asked Parish to come observe, and Parish found Collin asleep on the
floor.[23]  Collin’s
teacher said that she could not wake Collin, so Parish tried to wake him up by
tickling him.  Parish said that Collin’s eyes “just kind of rolled back in his
head.”  Parish was concerned that Mother had given Collin too much medication.  Collin
was carried to the nurse.

Estes
tried to check Collin’s pupils, but every time she opened his eyelids, his eyes
rolled up.  She tried to wake him but was not successful.  During the period of
time that Collin was in Estes’s office after he was brought in, he eventually
became less drowsy and was not drooling as much.

Estes
tried calling Mother six or seven times and could not reach her, so she decided
to call 911 because she did not know if Collin had been overmedicated, had taken
the wrong medication, had bumped his head, or had a blood clot.[24] 

Jason
Peterson, a paramedic and firefighter with the Lake Cities Fire Department,
testified that he responded on April 15, 2011, to a 911 call that was received
at 9:16 a.m. about a child “not acting right” at Stevens Elementary School.  He
was told that Collin was lethargic and nonresponsive.  When Peterson arrived at
9:20 a.m., Collin was sitting on a table; he was moving around and was able to
answer questions.  Peterson did not consider the possibility of a medication
overdose because Collin was not acting lethargic when he saw him; he was alert
and oriented to his surroundings.  Peterson testified that he had found
abrasions; one on Collin’s abdomen and two in his mid- to upper back area.
Collin told Peterson that he had been dragged by another child on some carpet,
which seemed like a plausible explanation to Peterson because the abrasions were
consistent with rug burns.  Peterson ultimately decided to take Collin to the
emergency room.  

During
the transport, Collin told Peterson that Mother had spanked him with a wooden
spoon and that when he asked Mother to stop, she did not.  Peterson was not
sure whether the abrasions on Collin’s abdomen or back had come from a wooden
spoon.  

Harris,
the CPS investigator, received a report that Collin was taken to the hospital
by ambulance because the school was initially unable to wake him. Harris went
to the hospital and saw Mother and Collin, who was awake and alert; Harris
testified that the scene was completely different than what the school had
reported.  Harris tried to talk to Collin, but Mother would not let her. 

Harris
learned that Mother had been giving Collin incorrect dosages of his Risperdal
medication; instead of giving him 1.25 milligrams in the morning and the
evening, Mother was giving Collin 0.5 milligrams in the evening and 2.0
milligrams in the morning.  When Harris confronted Mother regarding the
incorrect dosages, Mother responded that “it evens out throughout the day.” Mother
explained that Collin’s behavior indicated that it was better to give him more
medication in the morning because of his aggressive behavior.  Mother said that
Dr. Yaculic, the psychiatrist, was aware that Mother was giving the uneven
dosages.  During the same time frame, Mother gave Collin an additional pill
because he had spit out one pill, but Mother was not sure which medication it
was. The dosage of the medication that Mother gave Collin could have caused his
death. 

Due
to concern about Mother’s “continued poor choices,” Mother’s alcohol abuse, the
poor discipline choice that she had made in biting Collin, the Wellbutrin
incident in February, the Risperdal incident in April, and her prior CPS
history,[25] and
the “considerable safety threat that was presented” regarding Collin, CPS
decided to take custody of Collin and to petition the court for custody of
Carol. 

Mother
was very angry about the removal.  She “felt misunderstood” and thought that
she was being blamed for a lot of what was going on with Collin.  She admitted
that she had made poor choices and was not always as organized as she should
have been.  She said, however, that she had tried to communicate with school
staff, the psychiatrist, and the hospital about what was going on with Collin.  Mother
explained that when Collin’s medications were switched and continued to be
switched, it caused “a lot of ups and downs in his behavior.  And anybody
that’s not seeing the whole picture, all of the workings of what’s going on,
could easily misunderstand and misinterpret.”  Mother said that she wished that
Collin had been able to stay in the hospital longer for more professional
monitoring of the medication because it was hard for her to gauge what was
correct for him and it was hard for her to describe what was going on with him;
it was a lot for her to handle.  She said that when Collin is not under care
consistently for an extended period of time on that much medication with a
diagnosis like his, there were going to be changes in his mood and behavior and
how the medication affected him.  

U. 
Mother Is Arrested for Theft

Denton
Police Officer Ryan Rigdon testified that he stopped Mother on June 8, 2011, because
the asset protection team at Walmart had seen her stealing $31 worth of
cosmetics.  Carol was with Mother.  Mother was arrested for theft under $50.  

Mother
testified that she had little money and did not know when she would receive her
next paycheck.  Mother explained that there was no excuse for her choice that
evening; it was impulsive.  She further explained that she was dating someone
that she should not have been dating and that he was not necessarily a good
influence.  She said that stressful events had occurred; that she did not have
a happy outlook at the time; and that she was angry, was bitter, and was making
poor choices.  Mother believed that her negative attitude could have negatively
impacted Carol and that the episode at Walmart emotionally damaged Carol.  Following
the incident, Carol went with Mother’s friend John,[26] who took her to her great
aunt Patty.  Carol ultimately ended up in foster care. 

V. 
Mother Is Arrested for Multiple Offenses

Denton
Police Officer April McDonough testified that on July 5, 2011, Toby called the
police to report that his ex-girlfriend, Mother, had trashed his house.  Officer
McDonough arrived at 4:15 a.m. and noted that “there was stuff scattered all
over the front room.”  Toby told Officer McDonough that he and Mother had
gotten into an argument while she was intoxicated and that she had begun throwing
his items all over the living room when she could not find her keys to leave.  Toby
was hit in the back with a cross, and Mother had broken Toby’s eyeglasses and a
wooden box in which he stored a coin collection.  Mother had also picked up a
rock and had thrown it at Toby’s van, damaging the frame above the driver’s
window. 

Thirty
minutes after Officer McDonough left to prepare her report, she received a 911
call that Mother had returned to Toby’s house.  When Officer McDonough arrived
at 4:57 a.m., Mother was there, and Officer McDonough smelled alcohol on
Mother’s breath and noted that her speech was slurred and that she “was having
a problem standing.”  Officer McDonough performed the HGN test on Mother and
concluded that Mother was intoxicated.  Officer McDonough arrested Mother for
public intoxication, assault (throwing the cross that struck Toby), criminal
mischief, and interference with a 911 call (for intentionally unplugging the
phone while Toby was attempting to call police).[27]  

Mother
realized that the officer had stopped her from getting a DWI by arresting her for
public intoxication.  Mother admitted that she had made several bad choices
that evening.  When the Department learned of Mother’s arrest, they changed the
goal to termination, and Mother was very upset. 

Because
a marijuana pipe was found on Mother during her July 5 arrest, Moore, the
conservatorship worker, went to Mother’s home two weeks later to administer a
random drug test and to check out the home.  Moore noted that there were wine
glasses with partial amounts of wine near the sink.  Moore saw pills on the
counter that were not in a particular bottle and were not labeled,[28] as well as pills
in unmarked baggies inside the cabinets.  Moore testified that the pills would
have been within the reach of the children if they had been living with Mother.
 

W.  Mother
Is Intoxicated at Buffalo Wild Wings in 2011

In
2011, Swan, the FBSS caseworker, saw Mother at Buffalo Wild Wings, watched her
take a lot of shots, and noticed that she appeared “extremely intoxicated”
because she placed her head down on the bar like she was about to pass out.  Mother
approached Swan and said that she recognized her but could not place her;
Mother was slurring her words.  Swan pulled Mother aside, for confidentiality
purposes, and explained how Mother knew Swan.  Swan said that Mother told her
that she did not like her and left the bar with a man. 

Mother
recalled the incident and said that she was “buzzed” but was not intoxicated to
the point that Swan had described.  Mother admitted that she was with Toby that
night and that she knew he had a history of drinking and three DWI convictions.
 Mother agreed that it was bad judgment for her, as she was trying to remain
clean and sober, to be hanging out with someone who had a drinking history. 

X. 
Mother’s Job Changes

Mother
had a temporary job as an apartment assistant manager at Singing Oaks
Apartments in March 2011.  She lost that job because she had to take off time
for Collin’s hospitalization and the events that followed––biting a child at
school, biting at daycare, and doctors’ appointments.  She then worked at both
Smart Looks and Quik Cuts Fast Tans as a hairstylist.  Mother was fired from
Smart Looks and left Quik Cuts.  Mother
then worked at Smile Magic in Denton from September 2011 until April 2012. 

Y. 
Visits

Moore
observed thirteen visits.  During the first few visits, Moore noted that Carol
had meltdowns that were three times as bad as Collin’s.  She would hit, scream,
and swat at Mother.  Carol was not in CPS care at this point.

During
a visit in April 2011, Collin said that he wanted a funny face painted on his
face, but Mother painted a vampire on him.  Collin had a meltdown and cried
because he wanted it fixed.  Mother tried to fix it four times by adding extra
blood drops or by making it extra dark, but it never translated into funny.  After
Mother’s four unsuccessful attempts, Collin “shut down” and wanted to be alone.
 Mother had moved on by that point and was drawing butterflies and bracelets on
Carol.  

On
May 6, 2011, Mother “kept getting onto” Collin for not correctly bouncing the
ball to Carol; he was doing it correctly, only Carol could not catch it because
of her age and the size of the ball.  Mother started bouncing the ball harder
at Collin and hitting him in the chin.  Mother asked Collin why he was getting
angry, and he ultimately said that he did not like it when Mother hit him with
the ball.  Mother also brought a puzzle to the May 6 visit for the children to
work on, but Collin kept putting the pieces in the wrong place.  So Mother took
pieces out of his hand and put them in the correct place.  Mother then started
slapping pieces out of Collin’s hand.  Moore testified that she was concerned
about physical abuse because these incidents showed how quickly Mother’s
frustration escalated when Collin became even slightly defiant or annoying.  Moore
talked to Mother about implementing some new techniques. 

During
the May 27, 2011 visit, Mother started to use timeouts, but she was not using
them appropriately because she left the children in timeout too long.  Whenever
the children became too big of a challenge to Mother, she “would just move on
to something else and ignore the behavior and just let the kids do whatever
they wanted.”  Moore said that Collin cannot be allowed to do whatever he wants
because he will continue picking until he gets a response. 

During
the August 9, 2011 visit, Mother explained to the children why she had missed
the previous visit.  She said that she had to go to jail for biting Collin when
he was not being good and blamed him for her going to jail.  Moore interrupted
the visit and told Mother not to talk about arrests. 

During
a visit later in August 2011, Mother had been asked not to talk about the
children’s impending move to Belton because Collin was very anxious about it,
but Mother asked Collin if he had packed up all his things.  Moore called
Mother out into the hallway and threatened to end the visit if she continued
talking about the move. 

Z. 
Children Live with Jacki

Father’s
sister Jacki, who lived in Belton, testified that CPS had contacted her in the
fall of 2011 to care for the children.[29]  Her understanding was
that it would be a temporary placement while Father and Mother worked on trying
to get their life stable so that the children could be returned to them. 

CPS
decided it would be best for Collin to repeat kindergarten during the 2011 to
2012 school year.  When Collin came in the fall, he was on three prescriptions,
but the psychiatrist later reduced him to two.  When the medicine went down,
Collin was still able to control his behavior.  Collin saw a psychologist as
well, but the visits tapered off at the end of the school year. 

Jacki
said that sometimes Collin would wake up fine and get ready to go; other times,
he was defiant, and it was an effort to get him to go places.  Jacki used
timeout to discipline Collin.  On one occasion, he was sent home from school
for hitting a child.  He did well in school and played soccer. 

Jacki
described Carol as “real quiet and a little too grown up, more like a teenager,
sometimes.”  Carol tested Jacki at times and crossed her arms and rolled her
eyes sternly.  Jacki used timeout for her, and she was okay after that.  Carol
took dance, did well in school, and did not have any trouble. 

When
Jacki saw Mother at visits, the only question that Mother kept asking Jacki was
whether she had gotten the children on SSI; Jacki did not understand why that
was Mother’s primary question.  After visits, Jacki noticed that Collin would
“get a little more in trouble, . . . not following directions as much for a few
days.”  Jacki testified that the children never asked to see their parents;
they were happy when they saw them, but they were not devastated if they failed
to show up. 

Jacki
was not prepared to have the children long term, so they were moved to foster
care at the end of the school year. 

AA. 
Visits in Belton

While
the children were living with Jacki in Belton, Mother traveled to Belton to
visit her children; Rhonda Stinnett was the CPS worker who supervised the
visits.  Mother initially told Stinnett that her visits were four hours long,
that she was having visits on the weekends and at the park, and that she went
to the family’s home.  Stinnett looked into Mother’s claims and determined that
all visits needed to be in Bell County and under supervision in the CPS office.
 Stinnett saw that Mother had cut and pasted emails and had
changed the “to,” “from,” and “date” lines and that Mother was trying
to manipulate her to get extra visits or things her way.  Stinnett
said that she was afraid for her safety if they left the building during a
visit and no other workers were around.  So Stinnett had a person
come and witness her interactions with Mother so that there was no discrepancy
or confusion. 

Stinnett
characterized her working relationship with Mother as “difficult” and said that
Mother’s behavior during the visits was not in keeping with the required
guidelines.  Mother’s behaviors included putting the children in timeout and
not taking them out; whispering; talking about Father; telling the children
that they were coming home with her; telling the children about her services; and
opening up the door to where the caseworkers were, walking into that area,
putting her hands on Stinnett, and raising her voice in Stinnett’s personal space.
 By giving her children mints, Mother also disobeyed the rule that parents were
not to give anything by mouth; this concerned Stinnett because she was aware of
Mother’s history of giving Collin the wrong medication.  Stinnett gave Mother
leeway despite the fact that Mother had abused the visitation parameters.  Stinnett
told Mother that if she had to redirect her a third time, then the visit would
be canceled; no visits were canceled.[30] 

Stinnett
described the visits as “chaotic.”  Mother tried to engage the children in
activities but was only able to give one child attention, which caused the
other child to act out; both children wanted Mother’s attention.  When Collin
acted out, Mother put him in timeout.  One particular timeout, Stinnett went in
to tell Mother to take Collin out of timeout because he was not supposed to be
in for very long due to his age.  Mother refused, raised her voice at Stinnett,
and told Stinnett to allow her to parent and to leave the room. 

On
one occasion when Mother was setting up her laptop to videotape the visit,
Stinnett suggested how Mother could position the computer, and Mother slapped
her hand.  

During
the March 7, 2012 visit, Mother massaged the children while licking her lips
and closing her eyes; the children looked frozen, and Carol told Mother to
stop.  Stinnett went in and told Mother to stop, and Mother stopped immediately
without any arguing.  Stinnett believed that Mother was being sexually inappropriate
with her children.  Stinnett said that Mother was normally busy, but this
particular time, she was very subdued and had a strange affect.  Stinnett
thought that Mother should be tested for drugs but did not have the authority
to order a test. 

During
the visit on April 23, 2012, which was shortly after Father’s funeral, Mother
showed the children pictures of Father and whispered to them.  Although the
pictures were “happy pictures,” Stinnett was particularly concerned because she
had not received any information from the children’s therapist saying that this
was appropriate.  Mother started crying, the children started crying, and
Stinnett asked Mother to give her the pictures.  Mother ignored Stinnett and
put the pictures to the side where the children could see them.  Collin and
Carol started fighting over the pictures and then mentioned that their aunt had
told them that they would be moving soon.  Stinnett said, “[W]e never really
got back to a good place with that particular visit, the children were upset.”  

Mother
had some productive visits with the children when she praised them for their
school work, asked them about their activities, read books to them, engaged
them in songs, and cleaned up the room as a family.  Mother brought in coloring
books and kept them interested in coloring and stickers.  She also brought in a
plastic bowling set and inexpensive gifts.  But when Mother brought
activities like painting canvases, tie-dying, and making sock puppets, the
children could only sit and watch; they did not interact.[31]
 

At
the end of the visits, Collin was not receptive to Jacki’s requests to put his
seat belt on.  Mother did not offer help and did not encourage Collin to
cooperate.  Mother would stand by her car and smile, which prolonged the visit.


Stinnett
noted that the children seemed happy to see Mother at the visits.  Stinnett
sensed that Mother loved her children and that the children loved Mother. 

BB. 
Mother Goes to Court on Charges Involving Toby

In
December 2011, Mother went to court on the charges stemming from the incident
with Toby, and she was placed on deferred adjudication community supervision
for eighteen months.  The terms and conditions of Mother’s community
supervision included that she was not to have contact with Toby, that she was
not supposed to drink alcohol, that she was to participate in the Change
program, and that she was supposed to start the Change program within sixty
days of the order, which was December 19, 2011.  Mother was also required to
successfully complete within 181 days of the order the Domestic Violence Victim
Impact Panel, to pay all costs of the panel, and to pay community supervision
fees and other fines and fees.  Additionally, Mother was required to do eighty
hours of community service restitution, beginning within sixty days of the
order and doing at least four hours per week. 

CC. 
Case Gets Extended

          The
termination trial was reset in February 2012.  Mother received a six-month
extension.

DD. 
Mother Charged with Public Intoxication

Denton
Police Officer Lisa Martin testified that on March 30, 2012, she saw a female
walking down the sidewalk who appeared to be “extremely intoxicated” because
she was walking unsteadily and had bounced off a nearby building once.  It was
Mother; Mother told Officer Martin that her name was “Sandy.”  Mother
eventually gave her correct name but did not spell her last name correctly.  Mother
did not know her address.  A man approached and said that he and Mother had met
earlier in the evening and had fought, and he urged Officer Martin to allow
Mother to go home with him.  Officer Martin did not think that was a good idea
because he and Mother had just met and had already had a fight and because
Mother was intoxicated.  Officer Martin arrested Mother for public intoxication
because she was considered a danger to herself or others.  The jury viewed the
video from Officer Martin’s dash camera, which contained the audio of Officer
Martin’s conversation with Mother and showed Mother being walked to the patrol
car in handcuffs. 

Mother
testified that after she had finished an hour-long counseling session on March
30, 2012, with Vanessa Stabler during which they had talked about Mother’s hope
for a monitored return, Mother went drinking.  Mother met a guy at a bar and
got into a disagreement with him.  Mother admitted that she was intoxicated and
was in no shape to be walking to her home, which was fifteen minutes away by
car.  Mother went to jail that night and subsequently lost her job at Smile
Magic. 

Mother’s
decision to go drink after counseling in March 2012 triggered a motion seeking
to revoke Mother’s community supervision in her prior cases.  

EE. 
Mother’s Counseling 

Dr.
Michelle Greer counseled Mother in May 2010 and in 2011.  In May 2010, Mother
came two times and then did not return. 

Mother
began seeing Dr. Greer for counseling again in July 2011.  Mother
made significant progress, but her progress was short term.  Mother
was very positive about Carol but described Collin as “very challenging,” said
he had quite a few behavioral issues, felt that he was uncontrollable, and
wanted things to be better with him.  Dr. Greer was struck by the fact that
Mother said that Collin was struggling in foster care and that would prove that
he was the problem, not her.  Dr. Greer said this comment raised safety
concerns for Collin. 

Dr.
Greer testified that Collin’s behavior could stem from exposure to Mother’s
conduct.  Dr. Greer said that an environment of domestic violence in a child’s
early years can have a negative impact on a child and his behavior.  Dr. Greer
said that an environment where there is substance abuse of prescription drugs
or alcohol can also have a negative impact on a child’s behavior. 

Mother
mentioned that the children were difficult in the mornings.  Dr. Greer talked
with Mother about a “kid-friendly” schedule and encouraged her to maintain some
type of schedule even without the children so that she could address the issue
of being on time for work. 

Mother
admitted to Dr. Greer that she had some prior substance abuse issues and that she
had used alcohol and prescription medication in the last few years to cope when
she was stressed.  Mother reported that she had been involved in her aunt and
uncle’s church and was getting guidance and financial support there.  Mother
was “pretty untrusting” of others but felt that she could create a support
group through the church.  At that time, she was meeting with several women who
were mentoring her.  

Dr.
Greer testified that it concerned her that Mother had become intoxicated and was
arrested because it demonstrated that Mother continues to make the same choices
and to repeat the same behaviors.  Dr. Greer was not sure whether Mother could
be successful, but Dr. Greer thought it was a good choice for Mother to go into
another residential program.  Dr. Greer believed that Mother’s desire to keep
trying is a positive attitude, but it concerned her that Mother repeatedly made
the same choices over extensive periods of time even with intervention. 

Because
Mother needed appointments that would not interfere with her work schedule, Dr.
Greer referred Mother to Vanessa Stabler, who offered Saturday sessions. 

 Stabler,
Mother’s counselor from the end of October 2011 until April 5, 2012, testified
that Mother met with Stabler sixteen times and seemed to be engaged in the
sessions.  Stabler said that the goals for Mother were to accept responsibility
for her children being in CPS’s custody, to refrain from any substance use or
criminal activity, and to continue developing a support system. 

Stabler
discussed with Mother positive parenting approaches, appropriate consequences, how
to discipline using timeout, how to follow through with her children, and how
to develop and use positive coping skills for herself to decrease her stress
and to help her be more attentive to her children.  Stabler
worked with Mother on her self-indulgent behaviors.  Mother made progress in
this area by being more patient when working with the children and by setting more
appropriate consequences.  Stabler worked with Mother on finding resources to
help her with Collin including filial therapy and books on handling children
with ADHD.  Stabler assessed whether Mother understood and processed
the information that she was learning in therapy as Mother discussed her visits
with her children and showed Stabler two two-minute videos from the visits. 

While
Mother was in counseling, some of the circumstances that she faced included
losing her driver’s license, having to pay extra fees, having to figure out how
to manage on her own, and having to redevelop friendships that were positive
and healthy.  Stabler gave Mother examples of things that would help her relax
and decompress. 

Stabler
said that Mother seemed to grasp her issues with substance abuse; she knew that
because she had previously abused drugs, she could not use any kind of
substance casually.  Mother was involved in Celebrate Recovery and “was doing
other things” to help her maintain her sobriety.  Stabler
testified that she did not have any suspicions that Mother was abusing alcohol.
 Stabler said that the March 30, 2012 public intoxication was a one-time
relapse as far as she knew.  It caused Mother to lose her job and to violate
the conditions of her community supervision, and it did not help her situation
with CPS. 

Mother
talked to Stabler about being overscheduled;[32] she
was working full time, she attended counseling once a week, she attended Alcoholics
Anonymous (AA) groups and Celebrate Recovery, she was involved with her support
system at church, and she was undergoing intensive outpatient therapy.  Stabler
was aware that the Court-Appointed Special Advocate (CASA) and CPS wanted
Mother to obtain a second job in addition to what was already on her plate;
Stabler thought that was an unreasonable expectation.  But Stabler believed
that the services required of Mother were not over and above what CPS demands
of its other clients.  Stabler testified that “it’s possible” that
in trying to help Mother with services and overscheduling her, CPS had sabotaged
Mother because she had a tendency to get overwhelmed in having to meet demands.
 

Stabler
testified that her reports from October, November, and December said that
Mother was making progress and doing fantastic.  Mother also did well from July
2011 until April 2012.  Stabler testified that Mother had not ever quit working
towards getting her children back. 

Stabler
testified that following Mother’s arrest for public intoxication, Mother was
discharged from counseling because she went to rehab.  At that time, Mother was
still working on accepting responsibility for her children being in CPS’s
custody.  She did not deny responsibility or give excuses but had not accepted
full responsibility.  Stabler said, “There was responsibility to the point
where she did express guilt and remorse for the things that had occurred.” 

FF. 
Father Commits Suicide

          Father
lost his struggle with his mental illness in April 2012.  After Mother learned
of Father’s suicide, she went and drank alcohol and had sex with a man named
Jesse, whom she had met at the probation office and had given her number;
Mother initially denied all of this in her trial testimony and later admitted
that she had not been honest with the jury. 

At
the request of Father’s family, Mother was monitored at the funeral by Moore,
who attended the funeral with Mother and the children.  Mother was appropriate
at the funeral service.  The children wanted to be near Father’s ex-girlfriend,
and Mother handled that “okay.”[33]  Mother
gave the children appropriate gifts after Father passed away. 

Moore
had concerns about Mother’s mental health after Father passed away, and Moore
contacted Stabler to make sure that she was accessible to Mother.  Moore also
informed Stabler that Mother had been “switching the words around” and had been
“making the appearance to everybody on the outside that she relapsed after
[Father] died.”  Moore wanted to make sure that Stabler understood the time frame
during which Mother relapsed.  Mother took advantage of the additional
counseling sessions that she was offered. 

GG. 
Mother’s Services

In
the current CPS case, Mother was ordered to attend weekly counseling sessions;
to complete a drug and alcohol assessment and to follow all recommendations
from the assessment; to attend weekly visitations with the children at the CPS
office for two hours; to obtain employment and demonstrate employment
stability; to obtain housing and demonstrate housing stability; to pay child
support and medical support; to attend intensive outpatient; to attend residential
treatment; to take a life skills class; to complete a healthy relationships
course with Friends of the Family; to create a budget; to comply with MHMR’s
recommendations or the psychiatrist’s recommendations; to complete random drug
testing; and to refrain from criminal activity.[34]  Mother
was not asked to complete a psychological evaluation in this case because she
had completed one in the 2009 case.  Mother completed most of her services,
though there was a delay in fully engaging in her services.  Moore testified
that the Department reviews compliance with a service plan as a whole. 

Mother
had been in counseling six different times since the children were born.  Mother
took a life skills class through counseling and completed a healthy relationships
class. 

Mother
completed the drug and alcohol assessment but was still working on the
recommendations at the time of the termination trial.  Mother
was asked to complete drug treatment based upon a recommendation from the drug
and alcohol assessment.  The initial recommendation was for supportive outpatient
treatment, but after Mother was arrested, the recommendation was increased to
intensive outpatient treatment, which she successfully completed.  Mother also
completed residential treatment following her relapse.  Mother
had participated in approximately six treatment programs, including the one that
she was enrolled in at the time of the termination trial.  Mother also attended
Celebrate Recovery twice a week for five hours and attended AA and Narcotics Anonymous
(NA). 

Mother
missed approximately three visits due to incarceration.  Mother missed some
visits in Belton because she could not afford to make the trip from Denton. 

During
periods of the case, Mother was compliant with maintaining housing and
employment.  Moore said that Mother was required to complete a budget for CASA
but was not sure whether she had received a copy. 

Moore
believed that there was a three-month gap when Mother was not compliant with
her medication and was not seeing a psychiatrist. 

Mother’s
arrest in 2011 for criminal activity was in violation of her service plan. 

Mother
was not asked to complete parenting classes, but she completed an eight-week
parenting course that she paid for.  Mother had completed four
parenting courses over the years.  

HH. 
Mother Starts Intensive Residential Treatment at VOA

Barbara
Williams, a licensed chemical dependency counselor with the Volunteers of
America LIGHT Program, testified that the LIGHT Program is an intensive
residential treatment center for women and children.  Williams testified that
Mother came to the program in May 2012, after a lapse with alcohol, and
Williams became her counselor later that month.[35]  Williams
testified that Mother had issues with time management, which affected her
ability to maintain stable employment.  Williams said that Mother is
not lazy; Mother had been using her drawing and writing skills to work on the
VOA’s structure board, had created a budgeting spreadsheet for the residents,
and had given all the residents free haircuts.  Williams testified
that Mother had worked the program and had “tried very hard.” 

Williams
drug tested Mother three times.  Mother had not slipped back into drinking while
she was in rehab. 

On
July 27, 2012, there was an incident in Williams’s office following a
conference call to Mother’s probation officer.  Mother said that she had been
having a conversation with her probation officer about the difficulty of
getting her community service lined up.  Mother became upset and yelled at the probation
officer and Williams.  Williams and the probation officer confronted Mother
about her behavior and told her that she needed to stop blaming others for her
poor decisions.  Williams asked Mother to leave her office and come back when she
was calm and could listen.  Mother later returned, and Williams spent quite a
bit of time with her processing the situation. 

Williams
had helped Mother come up with a discharge plan in the event the jury returned
the children to Mother.  The discharge plan required Mother to obtain stable
housing, attend NA or AA support groups, contact her sponsor daily for the
first thirty days, and attend ninety twelve-step meetings in ninety days.  Williams
found Mother a place to stay at the Salvation Army’s women’s program, which
would allow Mother to have her children with her and would provide a structured
program to help Mother transition back to life without alcohol.  Williams
believed that the women’s program at the Salvation Army would be best for
Mother and her family to help Mother make the transition. 

II. 
Visits at VOA

Cindy
Dinsmore, the program coordinator at the VOA LIGHT Program, testified that she
had observed three of Mother’s visits with her children. Dinsmore testified
that Mother was very attentive and seemed organized; she planned ahead to have
structured activities, as well as snacks and drinks, for her children during
the visits.  Dinsmore had never seen the children be disruptive because Mother
was so attentive and kept them focused on her activities.  Dinsmore had not
witnessed Mother spank the children or discipline them inappropriately.  Mother
exercised patience during the visits. 

Dinsmore
said that the children always run to Mother, are very excited to see her, and
seem to have a good time at the visits.  Dinsmore testified that the children
appear to be bonded to Mother and that they love Mother. 

JJ. 
Children Moved to Ms. Debbie’s

Ms.
Debbie, the foster mother, testified that this is the second time that she has
fostered Collin and Carol.[36]  Ms.
Debbie kept the children in 2011 before they went to their relatives’ home for
the 2011 school year.  

In
2011, when Collin arrived at Ms. Debbie’s house, he did not want to listen to
rules; he bit or attempted to bite other children; he would hit or kick if he
did not get his way or if he wanted something that another child had; he did
not want to go to sleep; he did not want to sit at the dinner table; and he did
the opposite of anything that he was asked to do.  Ms. Debbie said that she
would talk through his behavior with him when he received a warning.  Ms. Debbie
disciplined using timeouts and used a routine, consistency, and rewards to
remold Collin’s behavior.  Ms. Debbie followed through with her promises in
order to build trust with Collin.  Ms. Debbie also had a color chart for
behavior, and beans were awarded for different tasks; after accumulating fifty
beans, the child could choose a prize from the treasure chest.  Collin’s
behavior improved; his outbursts were not as loud, and he became more cooperative.


Initially,
Ms. Debbie went to Collin’s school almost every day because he was not
listening to his teacher.  Ms. Debbie sat down with Collin, talked to him, and
reinforced that the same rules from her home applied at school.  Towards the
end of the school year, Ms. Debbie was going to Collin’s school less
frequently. 

When
Carol arrived, she was withdrawn, whiny, and wanted things her way.  By the end
of August 2011, she was not as whiny and was more cooperative.  Carol
also responded to the systems that Ms. Debbie had in place for rewarding good
behavior. 

While
the children were in Ms. Debbie’s home during 2011, they received play therapy
from Cindy Meyering.  The children received play therapy separately at first and
then together because Carol “was deathly afraid of being around” Collin and
would scream when he walked by her.  There was some progress, but they were
still working on that at the time of the termination trial. 

In
May 2012, Ms. Debbie learned that the children were no longer going to be in a
relative placement, and she asked for the children to come back and live with
her.  CPS returned the children to Ms. Debbie on June 2, 2012.  Ms.
Debbie said that she did not have to start back at ground zero with Collin; it
was a lot easier the second time.  Ms. Debbie said that Collin
is taking two medications now compared to the four he was taking when he came
in 2011.  She said that he is able to function better with less medication and
more activities. 

Ms.
Debbie transported the children to and from visits because they were afraid
that they would not come back to her house.  Initially, Collin was
upset after a visit with Mother, but he gradually became calmer with subsequent
visits. 

Ms.
Debbie said that both children do well.  Ms.
Debbie said that they do classes and activities all week, that they go
swimming, and that they go to the lake. 

Ms.
Debbie said that Collin and Carol are bonded to her and that she wants to adopt
them.  She loves them and believes that they are “great kids.”  Ms. Debbie said
that if she adopts Collin and Carol, she will be the mother of ten children,
four of whom are over age eighteen.[37] 

KK. 
Children’s Counseling

Cindy
Meyering, the clinical therapist who worked with the children while they were
in Ms. Debbie’s home, testified that when she first met Collin, he was “pretty
wild,” was quite suspicious, was emotionally agitated and frantic, and was
testing the adults’ limits.  Collin was repeating kindergarten and was
exhibiting a great deal of defiance, aggression, and an inability to pay
attention; he was hitting people and was “having a real hard time managing his
little childhood.” Meyering testified that Collin demonstrated behaviors,
actions, and speech consistent with a child who came from a home where his needs
were neglected. When asked whether Meyering saw signs that Collin could have
been the victim of physical abuse, she testified that she saw him hit quickly
when he was around other children, that he refused to do timeout, that he was
assaultive towards adults, and that it was very evident that he did not know
how to keep himself safe—running with dangerous items and trying to run out the
door.  When Meyering first saw Collin, he was acting out aggressively with
animals, which is a “pretty dangerous” indicator about the child and what he
has experienced.  Meyering testified that Collin’s behaviors indicated that his
early childhood experiences were chaotic.  Meyering worked with Ms. Debbie to
make it quiet and calm so that Collin would feel comfortable in his new
surroundings.  However, even with the counseling and the various
strategies that Ms. Debbie has in place, Meyering testified that Collin still
has problems. 

When
Carol was removed in 2011, she suffered from trauma and separation anxiety in
not knowing where she was supposed to be.  At the time of the termination
trial, Carol continued to suffer with a fear of being disciplined; backrubs
helped to calm her.  Carol still exhibited “creepy” facial expressions or
the “stink eye” in June 2012, which is concerning to Meyering because of the
intensity of it and because Carol’s eyes get very dark and laser in on a person.
 Meyering and Ms. Debbie have worked with Carol by asking her to describe her
feelings so that her words can match her face and so that she can have
confidence in expressing what she needs to say without having to hold it in. 

Meyering
said that the visits with Mother do not appear to have much value to the
children; they do not talk about them.  Collin and Carol did not talk
positively about Mother; they called her by her first name and mentioned things
that had happened in her care.  Meyering knew that Mother had a temper based on
what Collin had told her.  Collin repeatedly told Meyering that Mother had
bitten him.  Based on what the children had said, Meyering was concerned for
the children’s physical and emotional safety because she believed that Mother
had physically abused the children. 

Meyering
described Ms. Debbie’s home as a positive, healthy environment with a neat and
orderly system.  Both children showed visible improvement
while they were in Ms. Debbie’s home:  they thrived in the motivational system
that Ms. Debbie has in place to encourage good behavior; they were able to
trust adults; they have a better sense of self-confidence; they make
more positive decisions; and they adhere to the rules of the adults that they are
with in social situations. 

Meyering
testified that the children require a lot of care; they “warrant a lot of different
levels of attention.”  Meyering testified that the children need the stability,
the structure, and the age-appropriate activities that Ms. Debbie’s home
provides, as well as the support of knowing where their refuge is.  

Meyering
believed that the children’s relationship with Ms. Debbie is quite strong and
that they are positively bonded.  Collin and Carol have also become attached to
members of the household. 

LL. 
Mother’s Status at the Time of the Termination Trial

During
the trial, Mother completed the inpatient treatment program at VOA and enrolled
in the Salvation Army’s First Choice women and children’s program, where she
planned to stay for six months to a year.  Mother believed that the Salvation
Army program was better than living in an apartment because she would have
supervision and professional counseling. 

At
the time of the termination trial, Mother did not have an attorney in her
criminal case, which was set approximately two weeks after the termination
trial.  Mother was going to ask for an appointed attorney and was aware that the
District Attorney’s office was recommending extensive jail time, up to a year. 

Mother
testified that it is possible that she could be denied renewal of her dental
assistant license and her cosmetology license once the licensing authorities
learn of her criminal charges; she had not had to renew her licenses since she
had received the charges.  Mother’s driver’s license was not valid at the time
of the termination trial because it had been suspended. 

Mother
testified that she was painfully aware of the mistakes that she had made as a parent.
 Mother agreed that the children had to deal with the turmoil of her mistakes.  Mother
testified that she was disappointed in herself and that her children were
probably disappointed in her.  She said that Collin is harder to mold than a
typical child and that it is going to take a lot of patience.  Mother
said that she has a lot of patience and does not lose her temper easily,
despite the incident with Toby when she was intoxicated and the incident in her
counselor’s office.  Mother agreed that she had already received the benefit of
a village to help her raise her children.  Mother
testified that she had learned that she needs to engage more with people, that
she needs to form a healthy support system, and that she needs to role model
good behavior for her children.  She had learned that she needed to not react by
being “emotionally dramatic” but to process people’s reactions with maturity.  

Mother
testified that she loves her children and that her children love her.  Mother
testified that she had accepted responsibility for her children coming into
care; she said that her children had come into CPS’s care because she was not
managing her household, she did not have healthy relationships that are
necessary for a good support system, she did not have a handle on time
management, and she did not handle stress well.  Mother believed that she could
manage her household now. 

Mother
agreed that she got into trouble when she drank.  Mother admitted that during
the intensive outpatient treatment, she had trouble recognizing that alcohol is
a drug.  Mother testified that one thing that was different now is that she
knows that there is no way that she can safely drink alcohol ever again, and
that is what she is committed to. 

MM. 
Testimony Regarding Mother’s Parenting Abilities

Estes,
the school nurse, believed that Mother was a bad mom sometimes.  Estes
elaborated that she thinks Mother has had a hard life, has made some hard
choices, has not had a lot of support, and has not been able to do what she wanted
to do for her children.  Estes believed that the lack of a support system and
financial issues had impacted Mother’s ability to parent.  Estes
was not sure whether Mother loved Collin. 

Father’s
stepfather testified that the children are the victims of two bad parents and
that it is in the children’s best interest to be adopted by their foster
parent.[38] 

Father’s
sister Jacki testified that Father had told her that the children would thrive
better in a foster family.  Jacki said that she did not have trust in Mother.  Jacki
did not know Mother very well and said that she based her opinions on what she
had seen and heard.  Jacki did not believe that the timing was right for the
children to be returned to Mother because she felt that Mother had not made
progress as a result of the continued criminal charges.  Jacki testified that
it was best for the children to be placed in foster care and adopted by someone
who is able to spend time and energy with them.  Jacki believed that the children
would thrive with Ms. Debbie because she is very organized and very loving and
caring; Jacki did not know if the children would thrive with Mother. 

Dr.
Greer’s impressions of Mother are that she loves her children and is committed
to them, is very outgoing, speaks very well, and has a lot of potential, but
she lacks follow-through, possesses a lot of impulsivity, engages in a lot of
alcohol use and unstable relationships, and demonstrates a tendency to put her
own needs ahead of her children’s needs.  Dr. Greer said that Mother’s
dependencies could be very dangerous to the safety of the children.  Dr. Greer
testified that the termination trial exemplifies that Mother has had a
difficult time in providing an adequate environment for her children.  Dr.
Greer testified that past conduct is a good indicator of future conduct and
that Mother’s past conduct is a strong, negative indicator of her ability to
parent her children.  Dr. Greer opined that Mother would continue to have CPS
involvement over the years. 

Stabler
was not comfortable making a recommendation about whether Mother could parent
on her own because she had not made enough progress during the time Stabler saw
her and because Stabler had not seen Mother in the four months preceding the
trial.  But
Stabler testified that a parent facing a lengthy jail term was not a sign of
stability. 

Williams,
Mother’s VOA counselor, testified that Mother could be a good parent of little
children, even if one of the children has behavioral issues and  even when Mother
is having a bad day.  Williams agreed that Mother could not be a good parent if
she was off drinking rather than spending time with her children and that
Mother could not be a good parent if she was in jail for several months. 

Jean
Taylor, who ministered to Mother during the ninety days that she was at VOA,
testified that Mother was different from the other women at VOA because she had
“such a stability in her and a strength in her”; she was emotionally stronger
and more determined than the other women.  Taylor testified that she saw “a
very big change” in Mother and that she seemed to be even more spiritually
strong, confident, and sure of herself.  Taylor said that Mother had made
progress but was not perfect.  Taylor believed that Mother is 100% ready,
willing, and able to take care of her two children even though Collin has some
special needs.  Taylor believed that with some help, some guidance, and some
accountability, Mother could be a good parent because she was willing to learn
how to be a good confident parent. 

Sherry
Horton, who knew Mother from Celebrate Recovery, testified that in the three
years that she has known her, Mother has made a lot of progress in being more
transparent, more aware that she cannot do it by herself, and more open to
saying that she needs help.  Horton believed that the jury could feel good
about returning the children to Mother. 

Stevens,
who knew Mother from Celebrate Recovery, believed that Mother was making
progress and that Mother is a good mom and that she is ready, willing, and able
to take care of her children with the proper assistance and resources. 

NN. 
Mother’s Request and Plans for the Children

Mother
testified that she adores her children and wants to be their mother.  Mother said
that she would do everything to meet her children’s needs every day, that she
was prepared to handle Collin’s behavior, that she would not use physical
discipline, and that she would do her best not to drink.  Mother asked the jury
to return her children to her; she was ready, willing, and able to
provide them with a safe environment at the Salvation Army.[39]
 She believed that was in the children’s best interest.[40]
 

Mother
planned to complete her treatment at the Salvation Army and to seek employment.
 Mother said that her plan was to stay out of jail.  She was hoping that the
judge would reinstate her community supervision because she had already started
working her community service; the Change program was no longer in existence;
she had completed some of the other classes that had been asked of her; all of
her payments were up to date until she went into treatment; and she was working
with her probation officer to complete the remaining stipulations.  If
Mother goes to jail, she said that she would ask people from her church to take
care of her children.  But she had not lined up anyone because she “was
counting on having [her] probation continued.”  Mother believed that CPS would
become involved again if she could not find anyone to care for her children if
she goes to jail. 

Mother
agreed that stability is important for her children and that it is not ideal
for the children to stay in foster care until she is able to get her affairs in
order.  Mother, however, did not think the best plan would be for the children
to be with Ms. Debbie while Mother becomes sober, obtains employment, and quits
committing crimes.  But Mother admitted that Ms. Debbie was in the best
position to take care of her children right now.[41]


OO. 
The CASA Volunteer’s Observations and Recommendation

Sue
Smith,[42] the
CASA volunteer who had spent 500 hours on this case, testified that she had
walked through the children’s foster home environments, had talked to their
teachers and the principal, had attended Collin’s Admission, Review, and
Dismissal (ARD) meetings, and had checked with the therapists and the parents
to be able to document what is going on in the children’s lives and to report
to the judge.   

With
regard to Collin’s school issues, Smith testified that Collin repeated
kindergarten because he missed thirty-two days and was tardy eighteen times.  Smith
had suggested that Mother call in to the ARD meeting and listen on speaker
phone, but Mother did not, even though she was not working. 

Smith
observed twenty visits.  Smith never saw an eagerness on the part of the
children to see Mother; Mother had to ask the children to come and give her a
hug.  The children did not volunteer affection for Mother.  There were visits
when the children wanted to leave.  Although Mother tried to bond with the
children, they were not comfortable with the way that she tried to interact
with them.  Smith was not saying that the children do not love Mother; sometimes
they do not like her. 

Smith
observed the visit on November 16, 2011, during which Mother put Collin in
timeout because he would not say something nice about Carol; Mother left him
there for six minutes, and Stinnett interrupted the visit.  Mother became upset
and told Stinnett that she could handle the situation.  When Mother did not
remove Collin from timeout, Stinnett interrupted again.  Mother removed Collin
from timeout after seven and a half or eight minutes had passed.  Mother later
told the children that Stinnett was “a mess.”  Smith watched a videotape of the
visit, and it cut off before the inappropriate discipline; the videotape
contained only the “good part of the visit.” 

Smith
asked Mother to prepare a simple budget.  Mother gave her a very detailed
budget that she had prepared with the help of a church member.  When
Mother told Smith that she was looking for a second job, Smith encouraged
Mother to get more hours at Smile Magic.  By working only thirty-two hours per
week, Mother was not making enough to take care of her family’s needs.  Smith
testified that Mother had six jobs in the fifteen months that she worked with
her. 

Smith
agreed that Mother had, during her therapy, accepted responsibility for why her
children were in care, but Smith never heard Mother acknowledge her mistakes
and say that she did something wrong that caused her children to come into
care.  When Smith went to the rehab facility in June 2012 to observe a visit
with Mother and the children, Mother said that she had talked in her support
group about biting Collin and that the people in her group said that was not a
reason to have children removed.  Smith believed that Mother had slipped back
into the “it-wasn’t-my-fault” mode. 

Smith
encouraged Mother to stay out of trouble during the July 4 weekend and was
disappointed when she later learned that Mother had gotten drunk and had been
arrested for her actions at Toby’s apartment.  Mother’s continued criminal
activity was not a suitable environment for the children. 

Smith
believed that Mother was willing to provide the children with a safe
environment but that she was not able to do so.  Smith believed that the
children were vulnerable to abuse or neglect because of their young ages; they
did not have the capability to call someone when they were being disciplined
improperly. 

Smith
testified that it was not in the children’s best interest to ever live with
Mother again.  Smith was concerned about permanency for the children, which was
uncertain because Mother was facing possible jail time.  CASA[43]
recommended that Mother’s parental rights be terminated based on over a year’s
worth of factfinding, including Mother’s unstable employment, her criminal
history, and the feedback on how the children were doing in foster care.  CASA
believed that terminating Mother’s parental rights was in the children’s best
interest based on the lack of stability, the frequent job changes, the long
periods of unemployment, the repetitive pattern of falling off the wagon, the
time Mother spent in jail, and Mother’s inability to independently care for the
children. 

PP.  The Department’s
Recommendation and Plans for Children and the Children’s Counselor’s Agreement
Therewith

 

According
to Trulson, the Department’s workers did not feel like they could offer any
other assistance or help to support Mother.  Trulson testified that the
Department’s workers believed it was in the children’s best interest for
Mother’s parental rights to be terminated.  The Department’s plan was
for the children to be adopted by Ms. Debbie. 

Moore
testified that despite the fact that Mother had received treatment at VOA, the
Department felt that termination of Mother’s parental rights is in the
children’s best interest because the Department looked at the case as a whole
and saw substantial history with the family, criminal history, and alcohol
abuse.  The longest that Mother had gone without inappropriate behaviors in the
current case was six months, and in previous cases it was a year or a year and
a half.  Mother had continued to be impulsive and to make poor choices.  Moore
testified that it was in the children’s best interest to have permanency.  Moore
testified that termination is the only way towards permanency for Collin and
Carol. 

Meyering
testified that the Department’s plan to ask for the jury to terminate Mother’s
parental rights and for the children to be adopted by Ms. Debbie is a positive
plan.  Ms. Debbie can provide the long-term stability that the children need.  Meyering
believed that Mother’s plan to take the children to the Salvation Army with her
to continue her outpatient substance abuse treatment would derail the children
from the progress that they had made.  Meyering also believed that
if the children were returned to Mother, and she relapsed, it would have a
severe negative impact on both children’s futures and that it would increase a
sense of hopelessness in the children, which could manifest itself in many
negative ways.  Meyering agreed, however, that it will be traumatic for the
children to know that they will never see their parents again if Mother’s parental
rights are terminated. 

QQ. 
The Ad Litem’s Recommendation

In
the children’s ad litem’s closing argument, she asked the jury to make sure
that the next ten to fifteen years do not look like the last seven years of the
children’s lives. 

RR. 
Jury’s Verdict

After
hearing the above testimony and reviewing the exhibits that were admitted, ten of
the twelve jurors answered yes to questions one through six, finding that Mother
had engaged in conduct or knowingly placed Collin and Carol with persons who had
engaged in conduct that had endangered their physical or emotional well-being;
that Mother had knowingly placed or knowingly allowed the children to remain in
conditions or surroundings that had endangered their physical or emotional
well-being; and that termination of the parent-child relationship between Mother
and Collin and Carol is in the children’s best interest.  The trial court
thereafter signed a judgment terminating Mother’s parental rights to Collin and
Carol.  This appeal followed.

III.  Sufficient Evidence Supports Best Interest Finding

In
her first issue, Mother argues that the evidence is factually insufficient to
support the trial court’s best interest finding. 

A. 
Standard of Review

In
reviewing the evidence for factual sufficiency, we give due deference to the
factfinder’s findings and do not supplant the verdict with our own.  In re
H.R.M., 209 S.W.3d 105, 108 (Tex. 2006).  We determine whether, on the
entire record, a factfinder could reasonably form a firm conviction or belief
that the termination of the parent-child relationship would be in the best
interest of the child.  Tex. Fam. Code Ann. § 161.001 (West Supp. 2012); In re
C.H., 89 S.W.3d 17, 28 (Tex. 2002).  If, in light of the entire record, the
disputed evidence that a reasonable factfinder could not have credited in favor
of the finding is so significant that a factfinder could not reasonably have
formed a firm belief or conviction in the truth of its finding, then the
evidence is factually insufficient.  H.R.M., 209 S.W.3d at 108.

B. 
Presumptions and Best-Interest Factors

There
is a strong presumption that keeping a child with a parent is in the child’s
best interest.  In re R.R., 209 S.W.3d 112, 116 (Tex. 2006). 
Prompt and permanent placement of the child in a safe environment is also
presumed to be in the child’s best interest.  Tex. Fam. Code Ann.
§ 263.307(a) (West 2008).  The following factors should be considered in
evaluating the parent’s willingness and ability to provide the child with a
safe environment:

(1) the child’s age and physical and mental
vulnerabilities;

(2) the frequency and nature of out-of-home
placements;

(3) the magnitude, frequency, and circumstances of
the harm to the child;

(4) whether the child has been the victim of
repeated harm after the initial report and intervention by the department or
other agency;

(5) whether the child is fearful of living in or
returning to the child’s home;

(6) the results of psychiatric, psychological, or
developmental evaluations of the child, the child’s parents, other family
members, or others who have access to the child’s home;

(7) whether there is a history of abusive or
assaultive conduct by the child’s family or others who have access to the
child’s home;

(8) whether there is a history of substance abuse by
the child’s family or others who have access to the child’s home;

(9) whether the perpetrator of the harm to the child
is identified;

(10) the willingness and ability of the child’s
family to seek out, accept, and complete counseling services and to cooperate
with and facilitate an appropriate agency’s close supervision;

(11) the willingness and ability of the child’s
family to effect positive environmental and personal changes within a
reasonable period of time;

(12) whether the child’s family demonstrates
adequate parenting skills, including providing the child and other children
under the family’s care with:

(A) minimally adequate health and nutritional care;

(B) care, nurturance, and appropriate discipline
consistent with the child’s physical and psychological development;

(C) guidance and supervision consistent with the
child’s safety;

(D) a safe physical home environment;

(E) protection from repeated exposure to violence
even though the violence may not be directed at the child; and

(F) an understanding of the child’s needs and
capabilities; and

(13) whether an adequate social support system
consisting of an extended family and friends is available to the child.

Id. § 263.307(b);
R.R., 209 S.W.3d at 116.  

Other,
nonexclusive factors that the trier of fact in a termination case may use in
determining the best interest of the child include:

(A)     the desires of the child;

(B)     the emotional and physical
needs of the child now and in the future;

(C)     the emotional and physical
danger to the child now and in the future;

(D)     the parental abilities of the
individuals seeking custody;

(E)     the programs available to
assist these individuals to promote the best interest of the child;

(F)     the plans for the child by
these individuals or by the agency seeking custody;

(G)     the stability of the home or
proposed placement;

(H)     the acts or omissions of the
parent which may indicate that the existing parent-child relationship is not a
proper one; and

(I)      any excuse for the acts or
omissions of the parent.

Holley
v. Adams, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted).

These
factors are not exhaustive; some listed factors may be inapplicable to some
cases.  C.H., 89 S.W.3d at 27.  Furthermore, undisputed evidence
of just one factor may be sufficient in a particular case to support a finding
that termination is in the best interest of the child.  Id.  On the
other hand, the presence of scant evidence relevant to each factor will not
support such a finding.  Id.

C. 
Best Interest Analysis

          Here,
with regard to the section 263.307(a) factors, the record demonstrates that, at
the time of the termination trial, Collin was seven and a half and had been
diagnosed with ODD, depressive disorder, symptoms of distractibility, lack of
focus, and high levels of agitation; he was taking two medications to help with
his behavioral issues.  Carol was five and showed mild
symptoms of separation anxiety, as well as some very mild symptoms of depression
and oversensitivity.  The CASA volunteer testified that because of their young
ages, the children were vulnerable and did not have the capability to call someone
when they were being disciplined excessively.  Mother testified, and
Meyering agreed, that if Mother’s parental rights were terminated, it would be
detrimental to the children because they would lose both parents in a short
time span. 

          With
regard to the frequency and nature of out-of-home placements, the record
details that the children were removed in October 2009 and placed in a foster
home for a week before being moved to a relative placement with Patty.  In April
2011, Collin was removed, and Carol was removed in June 2011; the children were
placed with Ms. Debbie, then with their Aunt Jacki during the school year, and
finally were placed back with Ms. Debbie.  

          The
factual section above sets forth the magnitude, frequency, and circumstances of
physical and emotional harm to the children; it shows that the perpetrators of
the harm to the children were the parents; and it describes the history of
abusive or assaultive conduct by the parents.  In summary, the harm to the
children included witnessing incidents of domestic violence between Mother and
Father; Mother’s tying Collin’s hands and feet with pantyhose and leaving them
tied until his hands and feet turned purple; Mother’s giving Collin the wrong
medication; Mother’s giving Collin too much of his medication; Mother’s biting
Collin hard enough to leave teeth marks and severe bruising; Mother’s spanking
Collin excessively hard with a wooden spoon, which left substantial bruising;
Mother’s leaving the children with Father, during which time Carol was slapped;
Mother’s leaving the children with her mother, who was drunk; Mother’s exposing
the children to Toby, who had three DWI convictions; Mother’s incarceration for
theft, which resulted in Carol’s coming into CPS’s care; and Mother’s other
incarcerations, which resulted in her absences from visits with the children
and the loss of her job.

          The
children did not testify at trial, and so it is not clear from the record
whether the children were fearful of living in or returning to Mother’s home. 
The record contains conflicting evidence on the children’s responses to their
visits with Mother: there was some evidence that the children ran to Mother and
enjoyed their visits, and there was some evidence that the visits did not mean
much to the children, that they often wanted to end their visits early, and
that they called Mother by her first name.

          Collin’s
evaluation at MHMR in late October 2009 concluded with a diagnosis of
ADHD–Combined/Hyper-Impulse.  In February 2010, Collin’s psychiatrist noted that
he had ADHD and ODD.  Collin’s psychological evaluation from March 2010 contained
a diagnosis of posttraumatic stress disorder, chronic; ODD; depressive
disorder, not otherwise specified; and phonological disorder.  The evaluation
noted the family history of mental illness but stated,

[O]f even greater
concern is the significant physical abuse and emotional abuse that [Collin] has
endured over the years.  This is a child who has significant power and control
needs. . . . It is likely that he looks to try to help control situations
through the acting out behaviors as a way to have some sense of stability in an
environment which was unpredictably threatening in the family of origin.  He is
a depressed, traumatized little boy who is engaging in significant acting out. 
In the past, the mother was concerned regarding a possible attention deficit
hyperactivity disorder.  This evaluation does not support that disorder
although it does recognize the symptoms of distractability, lack of focus[,]
and high levels of agitation.

 

However, it is hypothesized that
symptoms are more driven by the underlying depression and traumatization rather
than a true attention deficit hyperactivity disorder. 

          Carol’s
psychological evaluation from March 2010, while she was staying with her great
aunt and uncle, revealed a diagnosis of separation anxiety disorder and adjustment
disorder with depression.  Carol exhibited some mild symptoms of depression and
oversensitivity, but for the most part, she “seem[ed] to be managing relatively
well.”  

The
results from Mother’s October 2009 psychological evaluation revealed that
Mother was diagnosed with adjustment disorder “with mixed disturbance of
emotions and conduct, chronic and severe and major depressive disorder,
recurrent.”  The psychological evaluation also revealed that Mother had a
history of opioid abuse and amphetamine abuse, that she had been the victim of
physical abuse and sexual abuse, that she had problems related to interactions
with the legal system/CPS, that she lacked a primary support group, that she
had problems related to the social environment, and that she had occupational
and educational problems.  Mother’s history of instability had created
emotional issues, including trust issues that limited her ability to form healthy
relationships.  Mother’s psychological evaluation stated,

Individuals with
similar testing results are generally immature, narcissistic, and
self-indulgent.  They often make excessive and unrealistic demands on
relationships.  Such individuals tend to seek attention and sympathy to access.
 Such individuals are often suspicious of others.  They resent demands made
upon them, and they often experience relationship problems.  Individuals are
mistrusting of the motivations of others and tend to avoid close emotional
involvement.

 

Individuals with similar testing results are often
hostile and angry.  They are resentful of authority figures.  Such individuals
often deny serious psychological problems through rationalization and
transferring blame to others.  They have difficulty accepting responsibility
for their own behavior.  Such individuals can be somewhat unrealistic and
grandiose in their self-appraisals.  They are often unreceptive to
psychotherapy. 

During
her psychological evaluation, Mother admitted to a history of substance abuse
prior to 2002, and the record revealed that Mother had continued to struggle
with alcohol abuse throughout the case. 

          Six
different times since the children were born, Mother had been in counseling.  Concerns
about Mother’s honesty were noted during counseling.

          With
regard to the willingness and ability of Mother to effect positive
environmental and personal changes within a reasonable period of time, the
record revealed that Mother had completed school for two certificates of employment
(hairstylist and dental assistant), that she had been able to secure places to
live, that she had been able to secure a vehicle,[44]
and that she had made some progress in therapy and her current treatment
program.  Mother knew how to get help and resources; she received help from
several churches and from relatives.  But the record also revealed that Mother
had made poor choices throughout the time that the case was pending and that
she was still in the process of making changes and had not fully transitioned
back to life on her own.  During the termination trial, she completed her
inpatient treatment at VOA and enrolled in a program at the Salvation Army,
where she planned to stay for six months to a year if she did not receive jail
time at her upcoming community supervision revocation hearing.  Mother had not
shown that she could fully effectuate changes or maintain them long term.

With
regard to Mother’s parenting skills, Matthews, the daycare director, testified
that the
children appeared to be fed and were clean, but the record also
revealed that Collin was always hungry and asked for extra snacks when he was
at Head Start and that he ate treats from the secretary when he was in school
because he was very hungry.  Mother appeared to care deeply for the children,
but she did not know how to appropriately discipline Collin when he misbehaved,
as evidenced by the pantyhose incident, the spankings with the wooden spoon,
the biting incident, and the lengthy timeout during a visitation.  While the
children were in foster care, pills for sexual enhancement were found on
Mother’s kitchen counter that would have been within the children’s reach. 
Mother had attempted to limit the children’s exposure to domestic violence by
leaving Father, but then she allowed the children to stay with Father and also
did not keep her temper in check.  Mother struggled to demonstrate an
understanding of the children’s needs and capabilities as she often brought
activities—such as painting canvases, tie-dying items, and making sock puppets—that
they could not participate in but could only watch. 

Mother
lacked an adequate support system for most of the case, but three people
testified in her behalf at the termination trial that they would support her
going forward.  

          With
regard to the Holley factors, the children’s desires were unknown
because they did not testify at the termination trial.  Although the children
appeared to love Mother, the record indicates that they would prefer to live
with Ms. Debbie.  They did not mention wanting to see Mother, they called Mother
by her first name, they had bonded with Ms. Debbie and her other children, and
they thrived when they were not living with Mother.

The
children’s key emotional and physical needs are a stable, secure, predictable,
and consistent environment.  Mother had not shown that she was able to meet
these needs consistently due to her alcohol abuse, which resulted in criminal
charges and eventually unemployment and homelessness.  Collin in particular
needed a home with stability, structure, and predictability, but Mother’s
frequent incarcerations and rehab impeded her ability to meet his needs.
Mother’s psychological evaluation revealed her narcissistic tendencies, and the
record as a whole demonstrated Mother’s inability to put her children’s needs
above her own. 

The
emotional and physical dangers to the children were many.  Due to their young
ages, the children were vulnerable and could not defend themselves against
Mother’s physical abuse and excessive discipline incidents.  Mother had exposed
the children to domestic violence and to inappropriate caregivers, including
Father, her mother, and Toby.  Mother had not shown an ability to stay sober
and to obey the law for any sustained length of time.

Mother
arranged for her counseling office to set up parenting classes and paid for
them on her own to demonstrate to CPS that she wanted her children back.  Mother,
however, struggled to implement the parenting skills that she had learned in
her many courses.  She continued to use excessive physical discipline, despite
twice signing a form stating that she would not do so; she did not use timeouts
properly; she chose activities that did not allow the children to participate;
and she struggled to engage both children at the same time.  

Mother
had been through a variety of programs and services through her FBSS and CPS
cases.  At the time of the termination trial, she had completed a ninety-day
inpatient rehab treatment program at VOA and was transitioning to a program at
the Salvation Army.  She had not transitioned back to life on her own and still
needed accountability.  She planned to continue attending Celebrate Recovery.  Mother
was resourceful in getting help and was seeking it out on her own. 

Mother’s
plans included having her children move in with her at the Salvation Army while
she completed more rehab there over a six- to twelve-month period.  She planned
to pay off her fines and seek employment.  But Mother’s plans were not carved
in stone because Mother faced the potential of jail time; a hearing on the
State’s motion to revoke Mother’s community supervision was set to occur a few
weeks after the termination trial.  The Department’s plan was for the children
to be adopted by Ms. Debbie.

Unlike
Mother, Ms. Debbie was not facing possible jail time but instead could provide
a structured, stable home for the children with consistent, appropriate
discipline and rewards.  She did not work and therefore had time to dedicate to
the children’s therapies and needs.  Meyering testified that the children need
the stability, the structure, and the age-appropriate activities that Ms.
Debbie’s home provides, as well as the support of knowing where their refuge
is. 

With
regard to the acts or omissions that indicate that the existing parent-child
relationship is not a proper one, we have thoroughly detailed Mother’s alcohol
abuse, her criminal charges and incarcerations, her inappropriate excessive discipline
tactics and physical abuse of the children, her decisions to leave the children
with inappropriate caregivers, her overmedicating and giving the wrong
medication to Collin, her homelessness and unemployment, and her approaching
revocation hearing that could result in additional jail time.  Mother testified
that no one failed in their efforts to help her.  However, at one point, she
blamed her work schedule for her inability to make some of her appointments; said
that she was still working the CPS program as well as doing classes through CPS
and working back in December, which is why she was unable to start her
community service hours; and blamed Collin and the school for her prior job
losses.  Williams testified that Mother also blames the treatment center, probation
officers, and CPS when she gets upset. 

Giving
due deference to the factfinder’s best interest finding, without supplanting
the factfinder’s judgment with our own, and after reviewing the entire record,
we hold that a factfinder could reasonably form a firm conviction or belief
that termination of the parent-child relationship between Mother and Collin and
Carol is in the children’s best interest.  See In re M.R., 243 S.W.3d
807, 820–21 (Tex. App.—Fort Worth 2007, no pet.) (holding evidence factually
sufficient to support best interest finding because parents exposed children to
domestic violence and drug abuse, mother had failed to obtain housing and
employment, and children flourished in foster care); In re J.L.C., 194
S.W.3d 667, 675–77 (Tex. App.—Fort Worth 2006, no pet.) (holding
evidence factually sufficient to support best interest finding because although
mother had attended parenting classes and was attempting to overcome her drug
addiction, mother had difficulty putting her child’s needs ahead of her own; had
exposed child to drugs when pregnant and continued to use after child was
removed; was involved in a life of crime, unemployment, homelessness, and
addiction; and could not provide a stable home).  Although contrary evidence
exists in the record––that is, evidence that not terminating Mother’s rights
would be in the children’s best interest––in light of the entire
record, the disputed evidence is not so significant that a factfinder could not
reasonably have formed a firm belief or conviction in the truth of its best
interest finding.  We overrule Mother’s first issue.

IV. 
Trial Court
Did Not
Violate Rule
605 or

Impermissibly
Comment on
Evidence

          During
the questioning of Ms. Debbie, she was asked, “If [Mother’s] rights are not
terminated, would you still be willing to keep the kids?”  The Department
objected based on relevance.  The trial court overruled the objection.  The Department
asked to approach, and the trial court excused the jury and held a bench
conference.  The Department explained that although their pleadings encompassed
a variety of alternatives, they were seeking only termination and had
consistently objected to anything outside the scope of termination.  Mother’s
counsel stated that if the Department was going to abandon a portion of their
pleadings, they needed to do so in front of the jury or else it would unfairly prejudice
Mother.  The Department responded that it had already made it clear through
their witnesses and that Trulson had already testified that the Department was
not seeking any sort of managing conservatorship or “joint sort of co-parenting.”
 The trial judge stated his intent to inform the jury that the Department was
proceeding solely on termination, and Mother objected outside the presence of
the jury, arguing that the issue of custody had been tried by implied consent.  The
trial court overruled Mother’s objection.  

The
trial court made the following statement when the jury returned:

I’m going to go ahead and address the jury at this time
to make it abundantly clear.  The State has elected, and had elected prior to
trial, to proceed on termination only.  So there are no other alternatives that
will be in front of the jury other than termination of parental rights. 

          In
her second issue, Mother argues that the trial court’s statement in front of
the jury—“So there are no other alternatives that will be in front of the jury
other than termination of parental rights”—constituted de facto testimony of
the judge as a witness in violation of Texas Rule of Evidence 605 or an
impermissible comment on the evidence. 

A. 
No Rule 605 Violation

          Texas
Rule of Evidence 605 states that “[t]he judge presiding at the trial may not
testify in that trial as a witness.  No objection need be made in order to
preserve the point.”  Tex. R. Evid. 605.  “The question should be whether the
judge’s statement of fact is essential to the exercise of some judicial
function or is the functional equivalent of witness testimony.”  Hammond v.
State, 799 S.W.2d 741, 746 (Tex. Crim. App. 1990)[45]
(quoting
27 Wright & Gold, Federal Practice and Procedure:  Federal Rules of Evidence
§ 6063 (1990)), cert. denied, 501 U.S. 1259 (1991).

          Here,
the trial judge’s statement did not convey factual information not in
evidence.  Nor did the trial judge’s statement seek to rebut any evidence
adduced at trial.  Instead, the trial judge’s statement told the jurors what
they would be asked to decide and was akin to a preview of the jury
instructions that would be given at the conclusion of the trial—all of which
would focus on termination, not custody or conservatorship.  Under the circumstances,
we hold that in instructing the jury that there would be no alternatives other
than termination before the jury, the trial judge acted within his judicial
capacity to give jury instructions.  The trial judge’s instruction was not “the
functional equivalent of witness testimony,” nor did it “convey factual
information not in evidence.”  See In re M.E.C., 66 S.W.3d 449, 457–58
(Tex. App.—Waco 2001, no pet.).  The trial judge thus did not testify.  Because
the trial judge did not testify, but instead acted in his judicial capacity in
giving a jury instruction,[46] we
hold that he did not violate rule 605.  See Tex. R. Evid. 605; Hammond,
799 S.W.2d at 746 (statements in furtherance of essential judicial functions
are not testimony); Newsome v. State, No. A14-88-00067-CR, 1989 WL 6927,
at *1–2 (Tex. App.—Houston [14th Dist.] Feb. 2, 1989, pet. ref’d) (not
designated for publication) (holding that judge’s comment was merely an
instruction to the jury to disregard the appellant’s attorney’s previous
testimony); accord In re A.L.W., No. 02-11-00480-CV, 2012 WL
5439008, at *11 (Tex. App.—Fort Worth Nov. 8, 2012, pet. filed) (mem. op.)
(holding that trial judge’s statement—that it was important for the jury to see
Mother’s behavior at the table during the trial—was not testimony because he
did not testify regarding disputed facts in the case).  We overrule the portion
of Mother’s second issue pertaining to a possible rule-605 violation.

B. 
No Comment on Evidence

          Within
her second issue, Mother also argues that the trial court’s instruction to the
jury constituted an impermissible comment on the evidence. 

A trial
court has significant discretion in expressing itself while exercising control
over the conduct of the trial.  See Dow Chem. Co. v. Francis, 46 S.W.3d
237, 240–41 (Tex. 2001).  A trial judge’s statement during the course of trial
impermissibly comments on the weight of the evidence if it “indicates the
judge’s opinion concerning a matter to be determined by the jury.”  M.E.C.,
66 S.W.3d at 458.

          The
prohibition against commenting on the evidence has its primary application in
the context of the jury charge.  Id.  Rule of civil procedure 277
provides that “[t]he court shall not in its charge comment directly on the
weight of the evidence . . ., but the court’s charge shall not be objectionable
on the ground that it incidentally constitutes a comment on the weight of the
evidence . . . if it is properly part of an instruction or definition.”  Tex.
R. Civ. P. 277.  Although rule 277 concerns the court’s charge, appellate
courts have applied the principle expressed therein to a court’s verbal
statements.  M.E.C., 66 S.W.3d at 458.

          Having
reviewed the record, we hold that the trial judge’s instruction did not
“indicate[] the judge’s opinion concerning a matter to be determined by the
jury”; it did not tell the jurors that they were required to terminate but
rather that termination was the only alternative that was being tried.  The
trial court thus did not violate rule 277’s prohibition on commenting directly
on the weight of the evidence.  See Tex. R. Civ. P. 277; Harris v.
Gen. Motors Corp., 924 S.W.2d 187, 188 & n.1 (Tex. App.—San Antonio
1996, writ denied) (determining that trial judge’s jury instruction—“In order
to answer this question yes, you must find that Irma Harris was wearing the
driver restraint system of the Camaro at the time of the occurrence in
question”—was not improper under rule 277).  To the extent the trial judge’s
statement encompassed his ruling on the questioning that took place prior to the
bench conference, the trial judge’s ruling is also not a comment on the
evidence.  See Rosales v. State, 932 S.W.2d 530, 539 (Tex. App.—Tyler
1995, pet. ref’d) (holding that trial court’s verbalizing to the jury his
ruling—“Ladies and gentlemen, you will disregard any testimony whatsoever about
court orders.  No consideration whatever about what was done or not done by
reason of court order”—was not a comment on the weight of the evidence).  We therefore
overrule the remainder of Mother’s second issue. 

V.  Conclusion

          Having
overruled Mother’s two issues, we affirm the trial court’s judgment terminating
Mother’s parental rights to C.C.K. and C.S.K.

 

 

SUE WALKER
JUSTICE

 

PANEL: 
WALKER, MEIER, and GABRIEL, JJ.

 

DELIVERED:  February 7, 2013









[1]See Tex. R. App. P. 47.4.





[2]See Tex. R. Jud. Admin. 6.2(a)
(requiring appellate court to dispose of appeal from a judgment terminating
parental rights within 180 days after notice of appeal was filed).  We note
that briefing was completed in this appeal on December 14, 2012, and that our
opinion is required to issue on or before February 19, 2013, leaving this Court
with less than seventy days to review approximately 1,800 pages of trial
transcript and approximately 1,200 pages of exhibits and to draft, circulate,
and issue this opinion.





[3]In accordance with Texas Rule of Appellate Procedure 9.8(b)(2), the
opinion will refer to the children using the following aliases: C.C.K. will be
referred to as Collin, and C.S.K. will be referred to as Carol.  See
Tex. R. App. P. 9.8(b)(2).





[4]Although
the record spells Father’s sister’s name “Jackie” in one place in the record,
we use the spelling “Jacki,” which is used consistently throughout the bulk of
the record.





[5]Father’s background included schizophrenia
disorder, bipolar type; alcohol dependence; cannabis abuse; physical abuse of a
child by history; borderline personality disorder; antisocial personality disorder;
and involvement with CPS.





[6]Ashton Moore, the CPS conservatorship worker who became involved in
the case in March 2011, testified that Mother broke the
safety plan by returning to Father when it was not safe.





[7]Father’s stepfather testified that he loaned Mother $1,500 to buy beauty equipment.





[8]Mother testified that Father had not been physically violent with
her until this episode.





[9]Mother testified that prior to this, Father had directed his anger
toward Mother; he had never harmed the children.





[10]Mother could not recall whether she had asked Father about taking his medication before or
after the incident.  When asked whether she would have let the children go with
Father if she had known that he was off his medication, she said, “At that
time, I probably would have.”





[11]Within the first week that Gregory taught Collin, she noticed while
Collin was in the bathroom that he had two distinct handprint marks on his
bottom.  Collin told her that Mother had spanked him.  On at least one
occasion, Gregory saw bruising on Collin’s upper arm that resembled fingers having
grabbed his arm, but Gregory did not recall asking for an explanation.





[12]Gregory noted that Collin always seemed hungry and asked for extra
snacks.





[13]Mother testified that in July 2009, she had gotten into a car
accident in rush-hour traffic, had lost her car, and her job.  During this same
time, she was trying to get in at MHMR so that she could get back on
antidepressants, but MHMR had a waiting list.  In the meantime, she was also
seeking help through the People’s Clinic of Denton.  Mother was also seeking
out help for Collin.  Mother
said that she was overwhelmed, depressed, and “stretched.”  Mother was not
turning to alcohol or anything else for relief from her anxiety or depression;
Mother felt like she had it under control at that time.





[14]It is unclear from the record why Mother was living with relatives
during this time period; Gregory’s testimony is the only mention of this.





[15]Mother
testified that in September 2009, she came home from work and found her mother
drunk.  Mother had heard from a friend that her mother was drunk when she went
to school to pick up the children.  Mother put the children to bed and then
told her mother that she could no longer watch the children; Mother’s mother
became upset, stumbled to her car, and dropped her forty-ounce beer in the
parking lot, waking the children.  That was the first time that Mother had
allowed her mother to watch her children.  Mother described her mother as a
“really bad alcoholic.” 

At that time, Swan had no concerns that Mother was abusing alcohol.
Mother reported during her psychological evaluation in October 2009 that she
drank alcohol occasionally, but she noted that she would only drink a glass of
wine on occasion. 





[16]Trulson saw in the records that Collin had to be moved from his
initial foster placement because of his behavior; he was a danger to himself
and others.





[17]Trulson testified that Mother had a problem staying on her medication;
when Mother stopped taking her medication, instability
and stress overwhelmed her.





[18]Mother later admitted that she had not learned enough at the end of
the this first case to handle things.





[19]Mother disagreed that she had five jobs during the monitored
return.





[20]Also in December 2010, Mother said that she was having financial
issues and could not pay her childcare bill or buy Christmas presents.  Matthews
took care of the $150 that Mother owed the daycare,
and the daycare purchased Christmas presents for Collin and Carol.





[21]Matthews later clarified that the only two times that Matthews
documented the early pick-up were March 25, 2011, when
the aggressive behavior plan was given, and April 14, 2011, after Collin
scratched a child.





[22]Mother was later arrested for the bite mark on Collin.  Mother
bonded out of jail after a few days, and the case was later no-billed by the
grand jury. 





[23]Parish had previously
observed Collin between five and ten times and had noted that his behavior varied from
being very sleepy and drooling to being very silly and out of control.





[24]Although one of the side effects of Collin’s medications is
drowsiness, Estes testified that Collin’s medication could not have made him
sleep to the degree that he experienced; he could not stay awake, he could not
walk, and he had to be carried.  Estes testified that Mother had attempted in
the past to have Estes medicate Collin in a way that differed from the doctor’s
orders, and Estes informed Mother that Denton ISD’s protocol required a
doctor’s orders for the dosage to be changed.  It
appeared—based on the written
instructions that Estes had received from Mother versus the prescription—that Mother was making “cocktails” in an attempt to adjust Collin’s behavior.  Estes said it was
possible that Mother had received instructions over the phone from the doctor
regarding changing Collin’s medication. 





[25]Mother’s previous case was dismissed in October or November 2010, and
the new case started in February 2011, which was cause for concern according to
Harris. 





[26]Mother later testified that she did not spend time with John on a
regular basis because he was addicted to Oxycontin.





[27]Officer McDonough found a marijuana pipe in Mother’s front pocket.  Mother
said that the pipe belonged to Toby and that she had taken it from him to irritate him.  Mother was not charged with possession of drug paraphernalia.





[28]Mother explained that the pills were a sexual enhancer.





[29]Mother and Collin had previously stayed
with Jacki during the 2005 FBSS case. 





[30]Moore initially testified that Stinnett had conducted herself in an
appropriate manner.  Moore
later agreed that Stinnett was assertive and bossy and said that she would have
intervened if she had known that Mother was being treated that way by Stinnett.





[31]The
jury watched a video of a visit that took place close to Halloween in which
Mother brought a tie-dye kit.  She had not read the directions beforehand and
did not realize that the activity would take the full two hours; she told the
children that she would bring it back another time.  During the visit, Mother
initially paid attention solely to Carol and her dolls, but during the latter
half of the visit, Carol played by herself while Mother helped Collin spell and
write words.  Both children called Mother “Mom” and sat in her lap, but Collin
did not return the hugs and kisses that Mother gave him.  Mother praised the
children for their manners and for their reports of good behavior at school. 
Mother was able to get the children’s attention when they were fighting and
explained how they could play together.  But for the mostpart, Mother was
unable to engage the children at the same time other than when she was serving
them cupcakes.





[32]Moore also met with Mother when she was feeling overscheduled, and
Moore went over how Mother could get her services done.





[33]Rachel Stevens, who had known Mother for a year through a Celebrate
Recovery group at church, testified that she took Mother to Father’s funeral
and that the children were excited to see Mother but were unsure about the
circumstances of why they were there.  Stevens said that the children talked to
Mother more than their “stepmother.”  Mother was nurturing and caring and answered the children’s
questions appropriately. 





[34]Mother also had conditions for her community supervision, which did not mesh with her CPS services, so Moore was not able to combine them. 





[35]Mother had to weigh the pros and cons of losing her home or going to rehab, and she chose rehab even though she knew that
her children would not be returned to her.  Mother’s apartment complex filed
suit to evict her while she was in treatment, and Mother lost her home in May
or June 2012. 





[36]Ms. Debbie had previously been a child care provider and a CPS
worker in California.  Ms.
Debbie was not married and did not have a job.  She received funds for
fostering, as well as disability for disk issues in her back and neck.  Ms.
Debbie’s home is licensed as a group home; she
owns a 4,000-square foot home with seven bedrooms. 





[37]At the time of the termination trial, Ms. Debbie had three of her
adopted children living with her, one was currently in trouble and was living
at a residential treatment center; she also had two foster children living with
her.  Ms. Debbie also had three of her older, biological children living with her
most of the time. 





[38]Father’s stepfather had
witnessed Mother grab Collin by the arm, pull him off his feet, and drag him
across a concrete porch when he wanted to talk to a neighbor; Collin was five
years old at the time. 





[39]Mother later said that there might be some questionable characters
at the Salvation Army. 





[40]Mother testified that she was not asking for her children back in
order to get Father’s death benefits that they were entitled to receive. 





[41]Mother testified that she had met Ms. Debbie and was comforted that
her children were in good hands. 





[42]Smith is a mother of three, is a grandmother of four, has a
bachelor’s degree in elementary education with a minor in psychology, has a
master’s degree in education, and taught school for thirty-two years before she
retired. 





[43]Smith testified that CASA’s decision was made by her and her
supervisor Sandy Moresco. 





[44]Mother had a car at the time of the termination trial, but it was
broken. 





[45]The Texas Supreme Court has relied on the Texas Court of Criminal
Appeals’s interpretation of rule 605.  See, e.g., Bradley v. State ex
rel. White, 990 S.W.2d 245, 248 (Tex. 1999) (citing Hensarling v. State,
829 S.W.2d 168, 170 (Tex. Crim. App. 1992)).  We do likewise.





[46]We likewise note that the trial court was under no duty to give a
jury instruction on conservatorship.  When the controlling question in a case
is termination of parental rights, as it is here, the trial court does not
abuse its discretion by refusing to submit jury questions on conservatorship.  See
Ayala v. Tex. Dep’t of Family & Protective Servs., No. 03-09-00121-CV,
2010 WL 3672351, at *4 (Tex App.—Austin Sept. 16, 2010, no pet.) (mem. op.)
(holding that trial court did not abuse its discretion by refusing to submit
jury questions concerning conservatorship because controlling question in case
was whether mother’s parental rights should be terminated).